**UNITED STATES of America,**
**Plaintiff–Appellee,**

**v.**

**Kenneth A. GRIMES; and Diana McGlynn, a/k/a Diana Lynn Hopkins, a/k/a Diana Lynn Grimes, Defendants–Appellants.**

**Nos. 91–6227, 91–6330.**

United States Court of Appeals,
Tenth Circuit.

June 26, 1992.

Michael G. Katz, Federal Public Defender, and Jill M. Wichlens, Asst. Federal Public Defender, Denver, Colo., on the briefs, for defendant-appellant Kenneth A. Grimes.

William P. Earley, Asst. Federal Public Defender, Oklahoma City, Okl., for defendant-appellant Diana Lynn McGlynn.

Ted A. Richardson, Asst. U.S. Atty. (Timothy D. Leonard, U.S. Atty., with him on the brief), Oklahoma City, Okl., for plaintiff-appellee.

Before SEYMOUR, SNEED,* and MOORE, Circuit Judges.

JOHN P. MOORE, Circuit Judge.

Diana McGlynn and Kenneth Grimes appeal from convictions for conspiracy to commit malicious burning (arson), aiding

* Honorable Joseph T. Sneed, Circuit Judge for the United States Court of Appeals for the Ninth Circuit, sitting by designation.

and abetting each other in the commission of malicious burning, and mail fraud. Although they have brought separate appeals, the cases are joined here for disposition because the defendants were tried together.[1] At issue is the sufficiency of the evidence, the guideline sentencing of Ms. McGlynn, and whether the district court properly ordered restitution.[2] We conclude the evidence is sufficient to sustain the convictions of both defendants, and Ms. McGlynn's sentence was proper. Because the record indicates neither defendant has present financial resources nor a reasonable expectation of future financial ability to pay the restitution ordered by the district court, we vacate that order but otherwise affirm the decisions of the district court.

The convictions of both defendants arise from the malicious burning of a business they ostensibly operated in Ponca City, Oklahoma, called the Marvel Makery and their attempt to fraudulently obtain insurance payments for the destruction of that business. Both defendants contend the evidence was insufficient because the government failed to prove they knowingly agreed to ignite, or actually ignited, the fire that destroyed Marvel Makery.

■ The government's case was entirely circumstantial. Yet, when viewed in a light most favorable to the government, the logical inferences which can be drawn from those circumstances support the convictions.

Although married to Robin McGlynn, Diana McGlynn adopted the family name of her codefendant, Kenneth Grimes, and lived with him in the months preceding the events of this case. Not only did the couple live together and hold themselves out to be married, but they also appeared to jointly operate Marvel Makery.

While Ms. McGlynn instructed employees and made other decisions, Mr. Grimes had full access to the business, delivering keys to employees so they could open the store, regularly picking up mail, and taking cash from the "till" for his own use. Finally, the insurance policy about which this case revolves was issued in the names of both defendants.

In short, there was ample evidence from which the jury could glean that both defendants acted together in operating Marvel Makery and managing its affairs. Indeed, that fact was not seriously contested.

The evidence also establishes in the months preceding the fire, Marvel Makery was in severe financial straights.[3] Inventories were not replenished; the physical appearance of the business deteriorated; creditors called continually to collect upon unpaid accounts or worthless checks; the SBA loan was two months delinquent, and the lender threatened foreclosure; employees were required to take their wages in trade rather than cash; the rent was delinquent; and daily sales were virtually nonexistent.[4]

The personal finances of both defendants were equally dismal. Judgments were recorded against Ms. McGlynn; her checking account was closed after months of overdrafts; her car was repossessed; and her only income was from a $2,200 monthly allowance she received from Mr. McGlynn. Tax records show Mr. Grimes' income was negligible, and he had no real source of income other than that provided by Ms. McGlynn out of her monthly stipend.

---

1. Mr. Grimes has submitted his case on the briefs.

2. Mr. Grimes also argues that during rebuttal to the jury, the prosecutor improperly commented on facts not in evidence. Not only was there no contemporaneous objection made to the comment, but also the facts upon which the comments were based are set forth in the government's exhibits 31A through 31D which were received in evidence. (R. VI, 260). Further review of this argument is not required.

3. The business actually ran at a substantial loss for most of the three years of its operation prior to the fire.

4. Ms. McGlynn's brief admits sales were "meager."

Although Marvel Makery's previous fire insurance policy in the face amount of $113,000 was cancelled for nonpayment of premiums, about nine days prior to the fire, Ms. McGlynn contacted her insurance agent to obtain a new policy. When the agent questioned her request to increase the coverage to $300,000 with a $250 deductible, Ms. McGlynn replied she was expecting a large delivery of merchandise for Christmas. She also stated her father was investing in the business and he requested the increase. Both reasons were proven untrue. Moreover, the agent testified the request of the low deductible was unusual because, with the coverage so high, most business people would have opted for the significant saving in premium that could be achieved with a higher deductible. He reasoned for most people the risk of loss would be low so the benefit of a higher deductible would be attractive.

Thereafter, a series of remarkable events took place. Within one week of the fire, the following occurred:

1. Ms. McGlynn obtained the policy and made a payment in cash for approximately one-sixth of the first year's premium;

2. Three to five days before the fire, Ms. McGlynn called the insurance agent to confirm the coverage;

3. Ms. McGlynn called a customer who was buying a piece of equipment on time and told her to remove the equipment from the store even though a substantial balance remained on the purchase price;

4. Bolts of fabric, boxes of yarn, and craft books previously located in the store were seen in the home of Ms. McGlynn's mother;

5. The day before the fire, a TV set and a copier were removed from the store;

6. The night before the fire, Mr. Grimes removed merchandise racks and boxes containing heavy material from the store, and Ms. McGlynn stated to a neighbor she and her mother were on the premises at a late hour because they were "cleaning out" the building.

Ponca City fire fighters responded to a fire call at Marvel Makery between 4:00 and 5:00 a.m. on September 8, 1989. At approximately 6:00 a.m., Mr. Grimes' mother went to defendants' home to inform them about the fire, but, when she did so, they did not seem surprised. On the next evening, Ms. McGlynn opined to a neighbor that the fire was started by her landlord's son who poured methanol though the ceiling and ignited it with a slowly burning candle.

Expert testimony established that the fire had an incendiary origin and was ignited by a "light" accelerant similar to alcohol or methanol. The accelerant could not be identified because it was totally consumed by combustion, leaving no traces.

Five days after the fire, Ms. McGlynn told an investigating insurance agent that the SBA loan was up-to-date and, because the business was so nice, several people had inquired about buying it. When questioned why she requested coverage in the amount of $300,000, she replied the figure was based on an estimate of the value of the store's inventory, equipment, and fixtures. She further claimed that the agent who sold her the policy suggested the coverage.[5] Ms. McGlynn also told the agent the business had been growing over the previous four to five years. These statements were all blatantly false.

On September 21, the same agent met with Mr. Grimes. He represented to the agent that the business was in satisfactory condition.

On November 10, 1989, an insufficient proof of loss for the Marvel Makery was received through the mail by the insurance company. Although signed by both defendants, the document was returned because it did not have incorporated an itemization of the lost inventory.

On January 19, 1990, a second proof of loss, again signed by both defendants, was

---

5. Later, in the same conversation, she stated it was she who picked the figure.

received through the mail. The return address on the mailer included the name, "K. Grimes." A written inventory was attached to the document which later proved to be identical to the store's 1986 inventory. The total claim was in the amount of $159,-676.99 for inventory, equipment, fixtures, and personal property.

An investigation of the proof of loss was initiated during which Ms. McGlynn gave a sworn deposition. She reiterated her previous claims that the SBA loan was current immediately before the fire and that the business had been in good financial condition. She also stated she had received regular deliveries of merchandise; she had not been having personal financial difficulties; and she believed the fire had been caused by an electrical problem. She claimed that she chose to pay her suppliers with cash on delivery and that her creditors had not forced her to do so. All these representations were patently untrue.

Approximately a month later, the deposition of Mr. Grimes was taken. He again claimed the business appeared to him to be growing. When questioned, he added he had taken cash from the register only once or twice. Although he was not asked whether he had removed anything from the premises the *night* before the fire, he admitted removing trash and a belonging of Ms. McGlynn's mother the *day* before the fire. These statements constituted a substantial dissembly.

In sum, it was established that both defendants, living on the largess of Ms. McGlynn's husband, in substantial debt, with a business that barely existed with unsalable inventory and facing foreclosure, schemed to obtain almost $160,000 after the business was destroyed in a malicious fire. From this, the jury was justified in inferring the fire was set to obtain the insurance proceeds. It was also presented sufficient evidence to determine that the defendants, the only persons who could have profited from the scheme, were responsible for setting it. Additionally, the government proved that both defendants used the mails to submit claims for losses they did not incur in a transparent attempt to obtain the proceeds of an insurance policy previously issued in their names.

"The evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—is sufficient if, when taken in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *United States v. Hooks*, 780 F.2d 1526, 1531 (10th Cir.), *cert. denied*, 475 U.S. 1128, 106 S.Ct. 1657, 90 L.Ed.2d 199 (1986). We review the record *de novo* for sufficiency of the evidence. *United States v. Kelly*, 888 F.2d 732, 739 (11th Cir.1989).

Guided by these standards of review, we believe there is only one possible conclusion. The defendants' acts were not only blatant but also naive. Contrary to their arguments in this court, their conduct gave rise to significant inferences of their criminal agency, linking them to all the charges beyond a reasonable doubt. We have no difficulty in concluding a reasonable jury would agree.

The evidence established the defendants acted in concert, each supporting the other, to burn Marvel Makery, to minimize their personal losses and maximize their potential for financial gain. Together they schemed to submit to their insurance company an obviously false claim to defraud the insurer of a substantial sum of money, using the mails for this effort. The evidence of their guilt is overwhelming.

■ In response to Ms. McGlynn's argument that the sentencing guidelines were misapplied, we review the district court's application of the facts with "due deference," while examining the overall application of the guidelines for errors of law, subject to a *de novo* review. *United States v. Banashefski*, 928 F.2d 349, 351 (10th Cir.1991). Moreover, we will not disturb the trial court's factual finding that the defendants' acts caused danger to others unless those findings are clearly erro-

neous. *United States v. Wilson*, 927 F.2d 1188, 1190 (11th Cir.1991); 18 U.S.C. § 3742(e).

▮ Ms. McGlynn contends the district court should have applied U.S.S.G. § 2K1.4(a)(3), which requires computation of the base offense level as 2 plus the base offense level for "Fraud and Deceit." It is her contention that the prosecution in this case was for fraud and that her acts did not present a substantial risk of injury or death, which is required for the sentence imposed by the district court under § 2K1.4(a)(2). One need merely look to the testimony of the fire fighters who responded to the Marvel Makery fire to see the fallacy in defendant's argument.

This testimony makes clear the persons attempting to quell the blaze were subject to danger of physical injury or death by the threat of a flashback explosion. Moreover, the heat and smoke within the building required them to take precautions to avoid further injury. Finally, the property of others was subjected to actual damage, and that of others was placed at risk. These are appropriate factors for application of § 2K1.4(a)(2). We join the other circuits which have applied similar factors. *See United States v. Wilson*, 927 F.2d at 1190 (surrounding businesses at considerable risk, fire fighters who fought blaze substantially endangered, and inhabited apartment complex 35 feet away); *United States v. Day*, 943 F.2d 1306, 1311 (11th Cir.1991) (substantial risk of death or serious injury to fire fighters on the scene), *cert. denied*, — U.S. —, 112 S.Ct. 1196, 117 L.Ed.2d 437 (1992); *United States v. Medeiros*, 897 F.2d 13, 19–20 (1st Cir.1990) (large fire endangered fire fighters and nearby apartment building); *United States v. Bos*, 917 F.2d 1178, 1182 (9th Cir.1990) (use of pipe bomb in commercial building located near public streets and pedestrian access).

▮ The district court did err, however, by imposing a requirement for restitution that the defendants have neither the assets nor the earning potential to pay. We review the district court's factual findings underlying the restitution order under a clearly erroneous standard, *United States v. Teehee*, 893 F.2d 271, 273–74 (10th Cir. 1990), and we review the amount of the restitution order for an abuse of discretion. *United States v. Rogat*, 924 F.2d 983, 985 (10th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 1637, 113 L.Ed.2d 732 (1991). To determine whether restitution should be required, and, if so, the proper amount, a sentencing court must consider the financial resources of the defendant and the financial needs and earning ability of the defendant and the defendant's dependents. 18 U.S.C. §§ 3556, 3663, 3664.

▮ Although indigence is not a bar to restitution, *United States v. Sunrhodes*, 831 F.2d 1537, 1546 (10th Cir.1987), we will not uphold the district court's exercise of discretion absent any evidence the defendant is able to satisfy the restitution order. *United States v. Clark*, 901 F.2d 855, 857 (10th Cir.1990). However, a restitution order will be affirmed if the evidence indicates a defendant has some assets or earning potential and thus possibly may be able to pay the amount ordered. *United States v. Rogat*, 924 F.2d at 985.

Here, the government concedes the evidence was insufficient to support the district court's restitution orders and confesses error. The court ordered the defendants to pay $128,279.05 in three annual payments of $42,000 following release. There was no evidence in the presentence investigation reports indicating either defendant had the capacity to earn sufficient income following release that would permit payments of that amount.

Indeed, in Ms. McGlynn's case, the court said, "[i]t's, of course, doubtful that she could pay much or at least any substantial amount of restitution." Given Ms. McGlynn's financial status, and six dependent children, the likelihood of her earning sufficient income to meet her financial responsibilities and pay the amount of the

restitution order is unrealistic. Given the history of Mr. Grimes' earnings in the three years prior to conviction, his earning capacity is no less dismal.

 The government agrees and suggests we remand for resentencing. Because there was an insufficient development of facts, we believe that is a proper course.

The judgments of conviction are AFFIRMED, but the orders for restitution are VACATED, and the cases are REMANDED for further consideration.