UNITED STATES of America,
Plaintiff–Appellee,

v.

Judy Louise Brown MARKUM,
Defendant–Appellant.

No. 92–6219.

United States Court of Appeals,
Tenth Circuit.

Sept. 8, 1993.

William C. Devinney, Oklahoma City, OK, for defendant-appellant.

Ted A. Richardson, Asst. U.S. Atty. (Joe Heaton, U.S. Atty., with him on the brief), Oklahoma City, OK, for plaintiff-appellee.

Before BALDOCK and BRORBY, Circuit Judges, and VRATIL[1], District Judge.

VRATIL, District Judge.

Judy Louise Brown Markum appeals her conviction for one count of conspiracy to commit arson and mail fraud in violation of 18 U.S.C. § 371, and one count of mail fraud in violation of 18 U.S.C. § 1341 by means of 18 U.S.C. § 2 (aiding and abetting). Markum also appeals her guidelines sentence for those offenses. Specifically, Markum contends (1) that evidence of guilt was insufficient; (2) that the district court erred in admitting expert opinion evidence; and (3) that the district court improperly enhanced her sentence under the United States Sentencing Commission, *Sentencing Guidelines* ("U.S.S.G.") § 3C1.1 (1988) (obstruction of justice based upon trial testimony) and § 2K1.4 App. C (amend. #330) (knowingly creating a risk of death or bodily injury). We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742, and remand for resentencing under U.S.S.G. § 3C1.1.

## I.

### *Sufficiency of the Evidence*

■ Evidence is sufficient to support a conviction if the evidence and the reasonable inferences drawn therefrom, when viewed in the light most favorable to the government, would allow a reasonable jury to find defendant guilty beyond a reasonable doubt. *See, e.g., United States v. Grimes,* 967 F.2d 1468, 1472 (10th Cir.1992), *cert. denied, McGlynn v. United States,* —— U.S. ——, 113 S.Ct. 355, 121 L.Ed.2d 269 (1992). The sufficiency of the evidence is a question of law subject to *de novo* review. *Id.*

The evidence in this case was as follows:

■ Markum and her co-defendant, Jackie Mullins, experienced severe financial difficulties as early as January, 1987. The property insurance on Markum's residence had lapsed for non-payment of premiums and the utilities were disconnected for non-payment on June 4, 1987. As a result, Markum vacated the residence and moved into her mother's home.

Mullins owned and operated Show Business Video and also lived with his mother. Mullins' video business did not fare well in the summer of 1987, and suppliers placed it on C.O.D. status. During this time, Markum and Mullins had little or no income. In September of 1987, however, they jointly obtained a $45,000 loan secured by a mortgage on Markum's home and the inventory of Mullins' video business. Markum and Mullins used the loan proceeds to pay off the first mortgage on Markum's home and to reinstate its property insurance. They deposited the remaining cash, totaling $21,000, in the video store business account.

On May 28, 1988, nine months after Markum and Mullins had reinsured the Markum home, fire destroyed the property. Markum had vacated the home some eleven months earlier and the house was apparently vacant at the time it burned. It had minimal furnishings, the lawn was grown up in weeds, at least one window was broken, and a rototiller and lawn mower occupied the kitchen. According to the first witness at the scene, the fire at that point consisted of two unconnected blazes: a large fire in the kitchen and a smaller fire in a back bedroom.

---

1. The Honorable Kathryn H. Vratil, District Judge of the United States District Court for the District of Kansas, sitting by designation.

The fire department extinguished the blaze and, before leaving the scene, inspected the attic for heat buildup and (as a precautionary measure) doused it with water. This effort, in total, consumed 1,100 gallons of water. About an hour after the firefighters returned to the station, however, they received a second alarm on the Markum house. Fire Chief Buck Pearson testified that when he and the firefighters returned, the Markum house was "totally involved, top to bottom, north, south, ... totally engulfed in flames." Only the foundation survived the second fire. Chief Pearson testified that he had seen fires rekindle, but never in such a short time or so completely. He testified that a quick and devastating rekindling is extremely rare because a house is soaked with water in the process of extinguishing the original fire. Chief Pearson therefore concluded that the second fire was "suspicious," and testified that, in his opinion, the second fire was a completely separate fire and not a rekindling of the first blaze.

Markum and Mullins were each at the residence between the time of the first and second fire.

A few days after the fire, Mullins and Markum went to various furniture stores to compile a list of personal property for insurance purposes. From one store they obtained a list which was clearly labelled "estimate." From another store they obtained a list of items which Markum had allegedly purchased there within the past two years. In fact, no purchases had been made at either store. After Markum and Mullins secured these lists, Mullins notarized the signatures of the store proprietors without their knowledge. On the first list, the phrase "estimate" was changed to "purchased 1989." Markum and Mullins submitted an insurance claim for all items on both lists. According to an insurance claim which Markum had previously submitted, however, some of the listed items had been stolen in a burglary some six months before the fire.

Markum gave Mullins a power of attorney and he claimed and collected the Markum house insurance proceeds on her behalf. As a result of Mullins' claim, the insurance company sent a check for $1,500.00 (representing an advance payment of benefits) to Markum's insurance adjustor in Norman, Oklahoma, via United States mails. The adjustor delivered the check to Markum at her mother's home in Pauls Valley, Oklahoma. On August 12, 1988, the insurance company paid Markum the balance of the proceeds. Three days later, Mullins took $1,687.00 of the insurance money and used it to pay past due premiums and reinstate insurance on the contents of his video business.

On September 30, 1988, fire destroyed the newly-insured contents of Mullins' video business. Markum had been working at the video store on a daily basis, in an unpaid capacity, for several weeks before the fire. On the day before the fire, a witness saw her remove a heavy cardboard box from the video store.

Around 7:55 a.m. on the morning of the fire, a witness saw Mullins sitting in his dark blue Chrysler New Yorker in a vacant parking lot about a block from the video store. According to the witness, Mullins drove slowly past the video store at about that same time, although Mullins usually did not arrive at the video store before 10:00 or 10:30 a.m. About two minutes before the fire broke out, another witness saw a white man with light hair (a description which fit Mullins) standing at the front of the video store, locking or unlocking the door. The witness later saw the same man, crying, at the scene of the fire. At 8:05 a.m., a police dispatcher made three attempts to contact Mullins by telephone at his residence, but received no answer.

Mullins' video store was located between a furniture store and a credit agency in a strip shopping center where all of the businesses (except those on either end) shared common interior walls. The video store suffered extensive damage in the fire. The adjoining credit agency and furniture store sustained damage, although to a lesser degree. No one was in the furniture store at the time of the fire, but the manager of the credit agency was in her office when the fire broke out. She escaped unharmed but badly frightened.

When firefighters arrived at the video store, the front door was locked and to gain entry, they broke through the plate glass. Once inside, they smelled a strong odor of gasoline. Chief Pearson testified that the

men had to act fast because they had a "tremendous fire inside . . . a hot fire, a dangerous fire." The firefighters feared an explosion and, as Chief Pearson testified, this was the type of fire where "one mistake would leave you a dead man." Expert testimony established that the video store fire was definitely incendiary in origin. Even Mullins agreed that the fire was the result of arson.

Mullins later submitted an insurance claim requesting reimbursement for loss of the contents of the video store due to "fire and theft." Mullins sent his proof of loss to the insurance company via U.S. mail. In all, Mullins claimed that 1,600 video tapes had been stolen or destroyed in the fire. Mullins claimed that a theft had occurred, although no exterior door or window showed signs of forced entry and witnesses testified that far fewer than 1,600 tapes had been in the store at the time of the fire. Also, some of what Mullins called "videos" were actually empty cases. After the fire, Markum and Mullins each asked adjacent tenants if anyone had been "poking around," asking questions about the fire.

■ When viewed in the light most favorable to the guilty verdict, the evidence adduced at trial and the permissible inferences to be drawn therefrom were sufficient to allow a reasonable jury to conclude beyond a reasonable doubt that: (1) Markum and Mullins conspired to commit arson[2] and mail fraud in violation of 18 U.S.C. § 371; and (2) Markum aided and abetted Mullins in the commission of mail fraud in violation of 18 U.S.C. § 1341 and was therefore properly convicted and punished as a principal under 18 U.S.C. § 2.[3] *See United States v. Grimes,* 967 F.2d 1468, 1470–72 (10th Cir.1992).

## II.

### Expert Testimony

■ The trial court's decision to admit expert testimony is reviewable for abuse of

discretion. *United States v. Barbee,* 968 F.2d 1026, 1031 (10th Cir.1992); *The Post Office v. Portec, Inc.,* 913 F.2d 802, 806 (10th Cir.1990). If appellant failed to object at trial or objected on grounds not now asserted as error, review is for plain error only. *Id.*

■ At trial, Markum objected to the introduction of Chief Pearson's expert opinion concerning the cause of the second fire, as follows:

I would object to that under Rule 704(a). I don't think it would be a necessary opinion to aid this Jury in the proper understanding of the facts of this case.

Rule 704(a) states in pertinent part as follows:

Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

Rule 704(a) is a rule that allows expert testimony in, not one that keeps it out. Under Rule 704(a), Chief Pearson could testify as to whether the second fire resulted from arson, so long as his opinion was otherwise admissible. Chief Pearson's opinion testimony was not objectionable under Rule 704(a). Markum's only other objection, at trial, was that the testimony was not necessary to aid the jury in its understanding of the facts. This objection implicates Rule 702, which reads as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, many testify thereto in the form of an opinion or otherwise.

Under the standard for Rule 702 announced in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469, the trial court must determine whether the expert is proposing to tes-

---

**2.** Arson is an offense against the United States when the arsonist maliciously damages or destroys by means of fire or explosive any building or property used in interstate commerce or in any activity affecting interstate commerce. 18 U.S.C. § 844(i) (Supp.1993).

**3.** A defendant does not have to actually mail or receive mail as long as use of the U.S. mail by another is reasonably foreseeable. *United States v. Bortnovsky,* 879 F.2d 30 (2d Cir.1989). In this case, use of the U.S. mail by the insurance company, to make payment on the insurance claims, was certainly foreseeable by Markum and Mullins.

tify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. *Id.* at ——, 113 S.Ct. at 2796. Whether the expert testimony will assist the trier of fact goes primarily to relevance. *Id.* at ——, 113 S.Ct. at 2795.

The very fact that fire departments have specialized arson investigation units argues that arson is an area of technical and specialized knowledge beyond the ken of the average juror. Whether the second fire was the result of arson was a factual question highly relevant to the case and properly addressed by expert testimony. Chief Pearson did not opine that Markum set the fire, but only that someone deliberately set it.

■■■ Because Markum did not object to Chief Pearson's qualifications as an arson expert, review on that question is for plain error only. *The Post Office v. Portec, Inc.,* 913 F.2d 802, 806 (10th Cir.1990). District courts have broad discretion in determining the competency of expert witnesses. E.g., *Quinton v. Farmland Indus.,* 928 F.2d 335, 336 (10th Cir.1991); *Kloepfer v. Honda Motor Co.,* 898 F.2d 1452, 1458 (10th Cir.1990); *Brownlee v. Gay & Taylor, Inc.,* 861 F.2d 1222, 1225 (10th Cir.1988). Experience alone can qualify a witness to give expert testimony. *See Farner v. Paccar, Inc.,* 562 F.2d 518, 528–29 (8th Cir.1977); *Cunningham v. Gans,* 507 F.2d 496, 500 (2d Cir.1974).

■■■ Chief Pearson worked as a firefighter and Fire Chief for 29 years. In addition to observing and extinguishing fires throughout that period, he attended arson schools and received arson investigation training. The trial court found that Chief Pearson possessed the experience and training necessary to testify as an expert on the issue whether the second fire was a natural rekindling of the first fire or was deliberately set. That finding was not clearly erroneous.

Markum asserts for the first time on appeal two other objections to the admission of Chief Pearson's testimony: (1) that Chief Pearson's testimony was confusing and misleading in violation of Rule 403; and (2) that Chief Pearson's testimony violated Rule 703 because it was not based on facts or data reasonably relied upon by experts in the field. Because Markum failed to assert

these objections at trial, review will be for plain error only. *See generally United States v. Jordan,* 890 F.2d 247, 250 (10th Cir.1989). Chief Pearson's testimony was relevant to the question of whether the second Markum house fire was deliberately set and was not misleading or confusing. The facts Chief Pearson relied on in forming his opinion were based on his own personal observation and the personal observations of the firefighters who worked for him and extinguished the first Markum house fire. The court finds no clear error here. The district court properly allowed Chief Pearson to opine that the second Markum house fire was deliberately set.

## III.

### *Sentencing Enhancements*

#### A. *Arson Guidelines Enhancement Level*

U.S.S.G. § 2K1.4 App. C (amend. # 330) establishes a base offense level for arson and directs that the base level be enhanced as follows:

(1) If the defendant knowingly created a substantial risk of death or serious bodily injury, increase by 18 levels.

(2) If the defendant recklessly endangered the safety of another, increase by 14 levels.

The district court determined that Markum had "knowingly created a substantial risk of death or serious bodily injury" with respect to the video store fire and therefore imposed an 18–level enhancement under § 2K1.4(b)(1). Markum argues that the district court erred in doing so because the fire was only a means to an ends, *i.e.* defrauding the insurance company. Markum argues that any endangerment to life or limb was at most "reckless" under § 2K1.4(b)(2) and not "knowing" under Section 2K1.4(b)(1).

■■■ This court will give deference to the district court's application of the sentencing guidelines to the facts and review questions of law *de novo. United States v. Shewmaker,* 936 F.2d 1124 (10th Cir.1991), *cert. denied, Shewmaker v. United States,* —— U.S. ——, 112 S.Ct. 884, 116 L.Ed.2d 788 (1992). Moreover, we will not disturb the trial court's factual finding that defendant's acts caused danger to others unless those

findings are clearly erroneous. *United States v. Grimes,* 967 F.2d 1468, 1471–72 (10th Cir.1992).

In *Grimes,* the court held that the defendant created a substantial risk of injury or death when the firefighters who attempted to quell a fire set by the defendant "were subject to danger of physical injury or death by the threat of a flashback explosion." *Grimes,* 967 F.2d at 1473 (citing *United States v. Wilson,* 927 F.2d 1188, 1190 (11th Cir.1991)). In *Wilson,* the court found that the defendant had knowingly created a substantial risk of death or serious bodily injury when he set a fire with multiple points of origin that put surrounding businesses at considerable risk, where firefighters were substantially endangered, and an apartment complex was located only 35 feet from the fire.

■ Here, the fire was set with gasoline during business hours. Firefighters were put in severe jeopardy because of the ferocity of the fire and the risk of explosion. These circumstances more than justified the district court's finding that Markum, as a co-conspirator, knowingly created a substantial risk of death or serious bodily injury. Markum's motive is irrelevant. The district court did not err in applying the 18–point enhancement under § 2K1.4(b)(1) instead of the 14–point enhancement under § 2K1.4(b)(2).

*B. Obstruction of Justice Enhancement*

The district court imposed a two-level enhancement under § 3C1.1 for obstruction of justice, on the grounds that Markum committed perjury at trial. U.S.S.G. § 3C1.1 provides as follows:

> If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.

According to the Sentencing Commission, an enhancement is warranted when the defendant has committed, suborned, or attempted to suborn perjury. Application Note 3(b).

Markum argues that the district court improperly construed the jury's verdict of guilty as a repudiation of her testimony and as equivalent to a finding that she had committed perjury at trial.

■ The mere fact that a defendant testifies to his or her innocence and is later found guilty by the jury does not automatically warrant a finding of perjury. *United States v. Hansen,* 964 F.2d 1017 (10th Cir.1992). An automatic finding of untruthfulness, based on the verdict alone, would impinge upon the constitutional right to testify on one's own behalf. *United States v. Urbanek,* 930 F.2d 1512 (10th Cir.1991).

■ To impose the two-level enhancement under § 3C1.1, the district court must specifically find that the defendant committed perjury. As the Supreme Court recognized in *United States v. Grayson,* 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978), the trial judge is entitled to observe the defendant at trial and consider in sentencing whether he or she gave perjured testimony. In *United States v. Hansen,* 964 F.2d 1017 (10th Cir.1992), however, we held that the trial court must specify which portion of the defendant's testimony it considers to be false. Perjury is not sufficiently demonstrated when the district court states simply that the "defendant was not truthful and has not accepted responsibility." *Id.* at 1020.

In *United States v. Dunnigan,* —— U.S. ——, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993), the United States Supreme Court set forth the procedure to be used by district courts in applying § 3C1.1:

> [I]f a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition we have set out. When doing so, it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding. The district court's determination that enhancement is required is sufficient, however, if, as was the case here, the court makes a finding of an obstruction or impediment of justice that encompasses all of the factual predicates for a finding of perjury.

*Id.* at ——, 113 S.Ct. at 1112.[4]

In the instant case, the district court finding was as follows:

> Well, in this case I interpret the verdict to be a repudiation of the testimony of the Defendants, and inherent in the verdict is a finding that testimony was not true and I accept that for purposes of sentencing.

TR. at 844–45.

█ Unlike *Dunnigan*, in which the district court expressly found that the defendant had failed to give truthful testimony on material matters that were designed to substantially affect the outcome of the case, the district court in this case apparently concluded that Markum had committed perjury because she testified to her innocence and the jury subsequently found her guilty. This is not a sufficient basis for application of the § 3C1.1 enhancement under *Dunnigan*. The record does not contain a specific finding that independent of the jury verdict, defendant committed perjury. Nor does it suggest what particular testimony the district court found to be untrue. The two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1 was therefore improper and the case must be **REMANDED** for resentencing in accordance with the procedure set forth in *Dunnigan*.

---

**4.** The Court defined perjury as follows: "A witness testifying under oath or affirmation violates this [perjury statute, 18 U.S.C. § 1621] if she gives false testimony, rather than as a result of confusion, mistake or faulty memory." *Id.* —— U.S. at ——, 113 S.Ct. at 1112. The Court said that this same definition of perjury applies in cases based on common law perjury. *Dunnigan* also holds that upon proper findings of perjury, the sentencing guidelines *require* a two-level enhancement. *Id.* —— U.S. at ——, 113 S.Ct. at 1112.