**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Don GONZALES, Defendant–Appellant.**

No. 94–6309.

United States Court of Appeals,
Tenth Circuit.

June 12, 1995.

Susan Dickerson Cox, Asst. U.S. Atty. (Rozia McKinney–Foster, U.S. Atty., with her on the brief), for plaintiff-appellee.

Mack K. Martin, Martin Law Office, Oklahoma City, OK, for defendant-appellant.

Before BRORBY, Circuit Judge, McWILLIAMS, Senior Circuit Judge, and OWEN,* Senior District Judge.

OWEN, Senior District Judge.

In the years at issue, 1985 through 1988, appellant Don Gonzales owned and ran a small company in Burns Flat, Oklahoma, named Star Rotating Heads, Inc., which leased patented rotating drill heads for oil drilling to operating oil companies. In 1993 he was convicted by a jury in the District Court for the Western District of Oklahoma on two counts of knowingly and willfully attempting to evade the payment to the Internal Revenue Service of the corporation's quarterly employment taxes, that is, withholding and federal contributions, for certain quarters starting in 1985 and going into 1987, in violation of Title 26, § 7201 of the United States Code.[1] Count 1 charged such an attempt to evade on or about December 2, 1987, and Count 2 charged another attempt on May 12, 1988. The defendant was sentenced to three years probation with a period of home incarceration of 120 days, and 100 hours of community service in lieu of a fine.

It appears that Star operated its rental tool business as follows. It bid for oil field jobs, and on a successful bid, a Star salesman would deliver the drill heads and associated equipment to the operator at the drilling site.[2] The operator would sign a field ticket for the rental from Star, and a copy of that field ticket was then brought or sent back to Star's office in Burns Flat by the salesman. There, a secretary—or sometimes even appellant Gonzales himself—would prepare an invoice from the field ticket and send the invoice to the oil company for payment. Since Star wanted to get paid as quickly as possible, the invoice was usually made out and sent within days of the receipt of the field ticket, sometimes even the same day.

After Star's tax delinquencies developed, the IRS, endeavoring to collect civilly on the delinquencies, levied on Star's known accounts receivable in late 1987. However, after the levies began, Gonzales began to retain field tickets in his briefcase for long periods of time rather than promptly invoicing them as described above. Thus, on December 2, 1987, the date as to which Count 1 speaks, the field tickets being held by Gonzales totaled in excess of $26,000, at which time Gonzales in an IRS Form 433 submitted to the agency under that date,[3] represented that Star's assets available to pay the delinquencies were only the $5,849.11 of receivables, on which the IRS had already levied. Next, on May 12, 1988, the date as to which Count 2 speaks, the field tickets held by Gonzales totaled over $100,000, at which time in a letter to the IRS,[4] he represented that Star's assets, beyond what it would be selling to satisfy a prior Small Business Administration obligation, would be zero.[5]

I.

Defendant first contends that the evidence at trial failed to establish his guilt beyond a reasonable doubt.

■ Our review is to determine whether

---

* The Honorable Richard Owen, Senior District Judge of the United States District Court for the Southern District of New York, sitting by designation.

1. Count 1 involved the quarters ending September 30, 1985, December 31, 1985, March 3, 1986, and June 30, 1986. Count 2 involved those four quarters together with the quarter ending December 31, 1987.

2. Star serviced sites in Oklahoma, Texas and Wyoming.

3. Form 433, is an eight-page printed IRS form calling for "Financial Condition and Other Information." It accompanied a written Offer-in-Compromise of $40,000 payable over six years to settle the IRS claim.

4. By this letter Gonzales was withdrawing the Offer in Compromise.

5. The IRS was focusing on those receivables, since only as to them did it have priority over the SBA.

The evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—is sufficient if, when taken in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt. We review the record de novo for sufficiency of the evidence. *United States v. Grimes*, 967 F.2d 1468, 1472 (10th Cir.) (citations omitted), *cert. denied*, — U.S. —, 113 S.Ct. 355, 121 L.Ed.2d 269 (1992).

 Here, for there to be a conviction, the jury was required to find beyond a reasonable doubt under the District Court's charge, the following three essential elements as to each of the Counts:

(1) That a substantial tax was due and owing from Gonzales' corporation, Star;

(2) That there was an affirmative attempt by Gonzales to evade or defeat that tax as alleged in each count in the Indictment; and

(3) That Gonzales' attempt to evade or defeat the said tax was willful.

The first element, that a substantial tax was due and owing, was never disputed and accordingly the jury was required to focus upon the alleged affirmative attempt to evade or defeat the tax and the willfulness of that attempt.

The evidence at trial clearly supports the jury's finding of affirmative acts designed to evade as charged in both Counts 1 and 2. In Count 1, the jury could reasonably have found an affirmative act of evasion in defendant's signing and filing of a false "Statement of Financial Condition". In that statement, Gonzales stated that "The IRS has already levied upon the only tangible assets, the accounts receivables," and these were elsewhere in the Form stated to be $5,849.11. The evidence, however, was that as of the date of signing the Form, Gonzales was holding field tickets for $26,000 in his briefcase. When IRS agent Cantrell followed up on Gonzales' Form 433 representations some months later in May 1988, Gonzales told him

that any accounts receivables Star had were uncollectible. Thereafter Gonzales, in July 1988, invoiced the held field tickets, in most instances directing payment to be made to a post office box in Noble, Oklahoma. Some of this money was then spent by Gonzales toward the purchase of a house in which he and his wife lived, as well as on other personal expenditures.[6] The conviction on Count 2 was supported not only by the foregoing, but specifically by the letter Gonzales signed and sent to the IRS dated May 12, 1988, at which time Gonzales was holding more than $100,000 of uninvoiced field tickets. That letter in relevant part stated:

> Since there will be no funds remaining from the sale of assets the corporation will be unable to pay the amount offered.

At the meeting at which the "assets" referred to by Gonzales in the letter above were sold, those assets were items of personal property, not accounts receivables, and as to the latter, Gonzales told agent Cantrell at that meeting that there were no such collectible items.

With respect to Count 2, the jury could reasonably find an affirmative act of evasion in defendant's withdrawal of his Offer in Compromise in which he asserted that he had no assets to satisfy the tax liability. Further evidence, in addition to that presented to support Count 1, established that defendant had applicable assets in excess of $100,000.00 at the time the letter of withdrawal was filed. Thus, as to each Count, the jury could find an affirmative act of evasion in defendant's failure to report his possession of substantial assets that could have been applied to his tax liability.

The evidence at trial was also sufficient to establish the willfulness of said conduct. Much of the invoicing of the held field tickets did not occur until long after the actual services were performed, unlike theretofore. The eventual invoicing was performed away from the business premises and in many instances, the debtors were directed to send checks to a Noble, Oklahoma post office box. Such holding and invoicing was not in the

---

6. Gonzales told an inquiring employee that the field tickets he was holding "... were his and that was his money...."

ordinary course of business and directed Star's assets where Gonzales expected the IRS would not be able to trace them. In sum, there was myriad evidence from which a jury could reasonably determine defendant's guilt on Counts 1 and 2.

## II.

■ Next, appellant Gonzales contends that a certain jury instruction, when taken together with the comments of the prosecutor in closing argument, violated his constitutional rights under the Fifth and Sixth Amendments resulting in the denial of a fair trial.

To assess appellant's contentions in this regard, it is necessary to review certain events as they developed during the trial. One of Gonzales' strategies was to have the jury conclude that having been so advised by his lawyer, he believed that a field ticket that had not been invoiced and mailed to the debtor was not a receivable, and accordingly he was not committing an affirmative act of evasion when he denied the existence of "accounts receivables." [7] While it is not clear whether defense counsel ever intended to call as witnesses Gonzales or his lawyer Goodman to support the defense, [8] the defense itself began to emerge during the cross-examination of prosecution witnesses such as Bruce Tharel, Gonzales' accountant. There, the defense attorney, over a strong hearsay objection by the government, was permitted to ask:

> Q. Mr. Gonzales had advised you that he was under the impression, based upon legal advice, that a field ticket was not an accounts receivable until it was invoiced or mailed? [9]

A. Yes.

Q. That would have been what he told you, his opinion of that was based upon advice he received from his lawyer; is that right?

MR. ANDERSON: Your Honor, I object. This is hearsay. We are now getting into the third person on the hearsay: "He told me that he said, that he said."

THE COURT: Overruled.

Q. (By Mr. Martin) Mr. Gonzales told you the basis of his opinion was from consultation with an attorney he paid; is that correct?

A. That's correct.

Given the receipt of this evidence, the government contended that such cross-examination of government witnesses [10] had opened the door to the government calling Gonzales' attorney as a witness as to what facts were given him by Gonzales as the basis for his advice upon which Gonzales claimed to rely. Specifically, the government stated it wished to examine into "Mr. Goodman's knowledge of *whether or not field tickets were being held.*" (emphasis supplied). However, the District Court declined to deem the attorney-client privilege to have been waived by such cross-examination, and further ruled that only Gonzales could waive it, which Gonzales at no time did. Accordingly, the government was precluded from this inquiry of the attorney. Next, with the record in this posture, the defense sought and the Court stated it would give a jury charge which read in part:

> You are advised that a defendant would not be acting willfully as section 7201 requires if he consulted in good faith an attorney whom he considered competent, if

**7.** This position was obviously undercut by IRS agent Cantrell who testified to asking Gonzales in May 1988 about accounts receivable and was told by Gonzales that there were "no such collectible items."

**8.** *Cf. U.S. v. Lindo,* 18 F.3d 353, 356 (6th Cir. 1994).

**9.** [Footnote by the Court] *But see* Black's Law Dictionary, which defines accounts receivable as, "Contract obligations owing to a person on open account," Black's Law Dictionary 36 (4th ed. 1968), and Webster's, which defines it as "[a] balance due from a debtor on a current ac-

count." Webster's Third New International Dictionary 13 (16th ed. 1971).

**10.** Doug Blair, called by the government as a witness, had been a Star employee, and later an investor in the successor company, Star, Limited. He testified in response to defense counsel's questioning on cross-examination that Gonzales had told him that a field ticket was not a receivable until invoiced and mailed. We note that Blair also specifically said that Gonzales had *not* said that he (Gonzales) had this belief on advice of counsel.

he made a full and accurate report to the attorney of all material facts of which the defendant had or should have had knowledge, and if he then acted strictly in accordance with the advice given to him by that attorney.

Accordingly, given that ruling, the government, in a charge conference, expressed the following understandable concern:

MR. ANDERSON: No. I simply don't want the jury left with the impression that there is a reasonable doubt created by the fact that the attorney was not called as a witness. I think they are entitled to know the law, that we are not permitted to call the attorney as a witness to testify to what the client told him. The issue is full disclosure.

The court below agreed, and added to the charge the following:

You are instructed that where legal advice of any kind is sought from an attorney in his or her professional capacity, communications relating to that purpose made in confidence by the client are permanently protected from disclosure by the client or the legal advisor unless the client waives the privilege.

With the stage thus set, defense counsel in summation predictably argued to the jury as follows:

Now, Don's relying upon the advice of counsel. Maybe it is bad advice. It is not Don's fault his attorney doesn't understand that a levy is a one-time thing. It is not an ongoing thing that these field tickets aren't any good. That is not his fault. This is consistent, exactly consistent with everything that has been brought out in this case.

This led up to that portion of the prosecution's summation which Gonzales contends denied him a fair trial:

MS. DICKERSON: In determining whether or not advice of counsel has any impact whatsoever upon this particular De-

fendant's intent, you have to determine that Mr. Gonzales made a full and accurate report. That's what it reads in the instruction. A full and accurate report to the attorney.

You don't have that before you, ladies and gentlemen. You do not have a full and accurate report made by this Defendant to his attorney. The only report he made to his attorney apparently was $5800 which had already been levied, because that's the report that Mr. Goodman submitted. We know that is wrong, because regardless of the date that you pick, there was at least almost $11,000 in accounts receivable not reported and not told.

Now, importantly, it doesn't matter what Mr. Goodman told Mr. Blair or what Mr. Blair told Mr. Goodman. Mr. Goodman was the attorney for Don Gonzales. Don Gonzales had to make full disclosure. Anything that Mr. Gonzales said to Mr. Goodman in terms of that disclosure is privileged. The instruction tells you that it is permanently privileged, cannot be told unless the client waives it, unless Mr. Gonzales waives it. Mr. Blair couldn't tell you what Mr. Gonzales told to Mr. Goodman.[11]

Gonzales asserts before us that this created "a negative and disapproving inference, for failure of this Appellant to waive his attorney/client privilege, (Sixth Amendment Right) and simultaneously comment on his failure to testify (Fifth Amendment Right)." (Br. p. 32)

In the total context, passing the issue as to whether such hearsay evidence should have been received or the jury so charged in the absence of testimony from either the attorney *or* the client as to the disclosure, or the advice, or the good faith reliance thereon, the prosecutor's comments were certainly a reasonable and permissible effort to deal with defense counsel's summation that "Don [relied] upon the advice of counsel." (*supra*). We in no way view this as a comment of the

11. Gonzales was, of course, entitled to decline to waive the attorney/client privilege, and to assert his constitutional right not to testify. This however, left the prosecution with the issue in the case as set up and argued by defense counsel, *see* pp. 510–11 *supra*, but with no competent evidence concerning the nature of the communication by the client to the attorney or what advice was given by the attorney, or whether Gonzales relied on it, or was in good faith in so doing.

defendant's failure to testify, and it was clearly not so intended. *United States v. Barton,* 731 F.2d 669, 674 (10th Cir.1984). And necessarily, a prosecutor is allowed substantial latitude in responding to a defense argument and the inferences therefrom. *United States v. Abello–Silva,* 948 F.2d 1168, 1183 (10th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 107, 121 L.Ed.2d 65 (1992). Accordingly, assessing the challenged portion of the prosecutor's summation in the context of the entire record, we deem it to have been proper comment, and in line with the law as the court would correctly charge, we do not, as appellant asserts, view it as prejudicial error. *United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985).

### III.

■■■■ A little troublesome, however, is the prosecutor's observation in her summation immediately following the language quoted above at p. 511, *supra:*

> So don't be confused by the issue of advice of counsel, because it does not—I repeat, it does not offer up a defense. It can only be used as a defense regarding intent, the issue of intent only, if you find *beyond a reasonable doubt* that there was full disclosure in this case. (underscoring supplied)

Obviously, the law places no burden on any defendant to prove an affirmative defense *beyond a reasonable doubt.* The record does not indicate whether the use of this language was a "slip of the tongue" or not. However, we note that in the flow of the summation, that language obviously escaped the notice of defense counsel who, immediately upon the conclusion of the prosecutor's summation, took strong and specific objection to the prosecutor's immediately-preceding argument, "We do not have a full and accurate disclosure as to the withholding of the field tickets." (*see* p. 511, *supra* ). Defense counsel, however, made no mention of the fact that the prosecution had used the language "beyond a reasonable doubt" in connection

with the assertion of the defense. Obviously, had defense counsel done so, there could and would doubtless have been an immediate curative instruction by the court, and that would have been the end of the matter. Further, we note that as we held in *United States v. Scott,* 37 F.3d 1564 (10th Cir.1994) at 1583:

> [R]eliance upon advice of counsel is a defense that the defendant must establish. *See Liss v. United States,* 915 F.2d 287, 291 (7th Cir.1990). Reliance upon advice of a lawyer does not negate willfulness unless the defendant completely disclosed all material fact. *See United States v. Samara,* 643 F.2d 701, 703 (10th Cir.), *cert. denied,* 454 U.S. 829, 102 S.Ct. 122, 70 L.Ed.2d 104 (1981).

Thus, the law does place *some* burden on the defendant to prove such a defense, and in this connection we also note that the court's charge correctly placed the burden upon the government to prove all the elements of each charge beyond a reasonable doubt. And specifically, the jury was charged as to willfulness and intent as follows:

> You are instructed that an intent to commit the crimes set forth in the indictment by the defendant is an essential element of the crimes charged against the defendant, and the burden is upon the government to establish such intent on the part of the defendant beyond a reasonable doubt.

Accordingly, viewing the charge as a whole with the burden clearly placed upon the government to prove each essential element of each charge beyond a reasonable doubt, and there being some burden on a defendant to prove the affirmative defense raised, and the prosecutor's use of the words "beyond a reasonable doubt" in connection with that defense going unnoticed by the alert ears of defense counsel, we conclude that the prosecutor's utterance of this phrase in this context to have been harmless error. *United States v. Hasting,* 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983).[12]

---

**12.** We need not and do not decide whether the "reasonable doubt" language as it was uttered here, is of constitutional cognizance, *see In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072–

73, 25 L.Ed.2d 368 (1970). Either way, the application of the harmless error rule of *U.S. v. Hasting, supra,* is apparent.

## IV.

 Appellant Gonzales' final contention before us is that he was entitled to a dismissal of Count 2 on the ground that he was entrapped *as a matter of law.* This is so patently lacking in merit as to hardly warrant discussion. For there to be entrapment, government agents must have induced the defendant to commit the offense and the defendant must not have been otherwise predisposed to commit the offense, given the opportunity. *U.S. v. Young,* 954 F.2d 614, 616 (10th Cir.1992). Gonzales' basis for this claim is the fact that the government, in the person of IRS agent Cantrell, prepared and typed up the May 12, 1988 letter (including a claimed "lie"[13]) which Gonzales signed, stating falsely that Star had no assets beyond those that would be going to the SBA.

But, on the record, the only evidence as to the preparation of the letter (Gonzales not having testified) is the testimony of agent Cantrell, which was:

Q. Could you just walk the jury through the steps of how this document [the May 12, 1988 letter withdrawing the Offer in Compromise] got generated?

A. Well, when he told me that he couldn't follow through with the $40,000 offer, then I told him we could reject it or he could withdraw it. Then he said, well, that would be fine if he just withdrew it, you know, it would save time and effort. It was my understanding that they were foreclosing on some of his assets and—the bank was and FDIC. So he said, well, if you would prepare the withdrawal, I'll—and send it to me, and I did.

Q. So did you type this up or have it typed up at the IRS?

A. I had it typed up and mailed it to him. He had the option of not signing it. There was no pressure put on him to sign it.

Q. To your best recollection, he signed it and mailed it back to the IRS where it was filed?

A. Yes.

This would not even have justified sending the entrapment issue to the jury where such a fact issue is normally and properly determinable, *Young,* 954 F.2d at 616. Further, in that connection, we note that the defense requested no charge on entrapment nor was one given.

Accordingly, the conviction appealed from is affirmed.

---

13. Gonzales' purported support for the "lie" evaporates under examination.