UNITED STATES, Appellee,

v.

**Gerard DiSANTO, Defendant–Appellant.**

No. 95–1584.

United States Court of Appeals,
First Circuit.

Heard Jan. 10, 1996.

Decided June 14, 1996.

Paul J. Haley, with whom Law Office of Paul J. Haley, Hillsboro, NH, was on brief, for appellant.

John M. Griffin, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, Boston, MA, was on brief, for appellee.

Before TORRUELLA, Chief Judge, COFFIN, Senior Circuit Judge, and CYR, Circuit Judge.

TORRUELLA, Chief Judge.

After a nine-day trial, Appellant Gerard DiSanto ("Appellant") was convicted for attempted arson in violation of 18 U.S.C. § 844(i), the federal arson statute, which makes it a federal crime to destroy by means of fire property used in or affecting interstate or foreign commerce; and for conspiracy to commit arson in violation of 18 U.S.C. § 371. Appellant appeals his conviction as well as his sentence on a number of grounds. For the following reasons, we affirm the district court's judgment and sentence in all respects.

### FACTUAL AND PROCEDURAL BACKGROUND

Presenting the facts in the light most hospitable to the jury's verdict, *see United States v. Staula,* 80 F.3d 596, 599 (1st Cir. 1996); *United States v. Ortiz,* 966 F.2d 707, 711 (1st Cir.1992), *cert. denied,* 506 U.S. 1063, 113 S.Ct. 1005, 122 L.Ed.2d 154 (1993), the evidence presented during the nine-day trial tended to show the following.

The Galleria II was a family-style restaurant and pub serving Italian food and pizza, located in Westport, Massachusetts (the "restaurant"), which was owned by three partners: Appellant, Robert Ashness ("Ashness") and Dr. Louis Aguiar ("Dr. Aguiar"). The restaurant was located in a building which Appellant and Ashness leased from Dr. Aguiar and Fernando Lópes ("Lópes"). The lease agreement provided, among other things, for a monthly rent of $3,600 and an option for the restaurant owners to purchase Lópes' share in the property. The restaurant received natural gas and food supplies that moved through interstate commerce.

Although very successful during the summer months of 1991, its first year of operation, the Galleria II's business proved to be seasonal and business slowed considerably after the summer. In addition to the slow business, there were significant problems with the building's water and septic systems and the relationship between Appellant and Dr. Aguiar deteriorated over who was responsible to pay for the required improvements: the restaurant, as tenant, or Dr. Aguiar and Lópes, as landlords.

Among the Galleria II's employees, Randy Schaller ("Schaller") served as chef and as kitchen manager; and Shelley McKenna ("McKenna") served as the bar manager and hostess and was also responsible for the cash and bookkeeping. Both Schaller and McKenna had longstanding business relationships with Appellant and considered him a friend. Beginning in the fall of 1991, Appellant began discussing with Schaller the need for renovating the restaurant. In addition to correcting the water and septic systems, Appellant proposed that an outside roof-top deck be installed for the purpose of increasing liquor sales during the peak summer season. Appellant told Schaller that he wanted to finance the renovations by burning the top of the restaurant above the second floor as the insurance proceeds from the fire would provide funds for the renovations. As part of his plan, Appellant increased the Galleria II's existing insurance coverage (building, contents, and premises liability) by purchasing $90,000 of business interruption insurance, which became effective December 3, 1991, two months before the arson attempts. The proceeds from the business interruption coverage could have been used for any purpose, including for the repair of the water and septic systems.

On or about February 19, 1992, after unsuccessfully attempting to hire someone else to burn the top of the restaurant, Appellant attempted to set a fire himself by igniting a stack of papers in the attic of the restaurant. The fire burned out, however, before it could fully ignite the exposed wood frame. Both Schaller and McKenna, who had been drawn to the attic because of the open attic door,

discovered Appellant standing over the burning stack of papers and refused to get involved. During the days following his first failed attempt, Appellant asked Schaller if he would help by pouring gasoline on the attic rafters as part of a plan whereby Appellant would return later to ignite the gasoline. After repeatedly declining to get involved, Schaller finally agreed to assist Appellant.

Shortly after noon on February 23, 1992, Schaller poured gasoline, as Appellant had requested, onto the exposed attic rafters and insulation and informed Appellant that he had done so. About mid-afternoon, Appellant and Schaller left the restaurant. At approximately 4:00 p.m. that same afternoon, the Westport Fire Department responded to a complaint from the restaurant that there was a strong odor of gas, which both patrons and employees at the restaurant had detected. After evacuating the building, the firefighters discovered the gasoline-soaked boards and insulation as well as evidence of charring on the attic floor and ceiling. According to the fire department, the charring was unrelated to the much larger area of the attic that was saturated with gasoline, representing a separate, previous attempt to start a fire.

A few days later, Schaller admitted to the police that he had poured the gasoline. Although Appellant told law enforcement officials that he would fire Schaller when they informed him of Schaller's confession, Appellant never fired Schaller, and Schaller worked at the restaurant until it closed. On December 6, 1993, Schaller entered a plea of guilty to the federal indictment charging him with the second attempted arson. Pursuant to his plea agreement, he agreed to cooperate with law enforcement officials. As part of that cooperation, Schaller engaged in four conversations—three in person and one by telephone—with Appellant that were recorded by law enforcement agents.[1] In July 1994, a two count indictment was returned by the federal grand jury charging Appellant with attempted arson of a building affecting interstate commerce under 18 U.S.C. § 844(i) and conspiracy to commit arson under 18 U.S.C. § 371. Prior to trial, Appellant filed

---

1. The conversations occurred on February 24, March 1, March 4, and May 25 of 1994.

a motion *in limine* to exclude from evidence the four recorded conversations between Appellant and Schaller, which included incriminating statements made by Appellant. After a hearing, the court denied the motion and admitted the tapes after certain portions were excised.

During a nine-day trial on the merits, in which nine witnesses testified for the prosecution (including Schaller, pursuant to his plea agreement), the prosecution presented its theory that Appellant attempted to burn the restaurant in order to recover insurance proceeds to finance renovations and improvements of the restaurant. The defense called three witnesses, including McKenna. Among other matters, the witnesses testified that Schaller's reputation for truthfulness was "zero;" that the business interruption insurance was purchased as a result of significant storms which had caused the Galleria II to close; that, after leaving with Schaller during the afternoon of February 22, Appellant had no intention of returning to the restaurant; and that Appellant was with McKenna during the evening of February 22, planning their next day's business trip.

During the trial, Appellant moved for a mistrial, which was denied, on the grounds that improper testimony regarding his ownership of a "gay night club" was prejudicial. Both at the close of the government's case-in-chief and at the close of all the evidence, Appellant moved for judgment of acquittal on the ground that the evidence was insufficient to establish that the Galleria II was a building affecting interstate commerce. The district court denied both motions.

Based on the foregoing and other evidence, the jury convicted Appellant on February 10, 1995, on both counts of attempted arson and conspiracy to commit arson. Appellant subsequently moved for a new trial which the district court denied. On May 25, 1995, the district court sentenced Appellant to a term of seventy-eight (78) months' imprisonment, imposed a fine of $12,500, restitution to the Westport Police Department in the amount of $386, and ordered supervised release for three (3) years. Appellant appeals both his conviction and his sentence. We have jurisdiction pursuant to Rule 4(b) of Federal Rules of Appellate Procedure.

## DISCUSSION

### I. Appellant's Motions for Judgment of Acquittal

Appellant claims reversible error in the denial of his motions for judgment of acquittal. *See* Fed.R.Crim.P. 29. Below, Appellant based his motions for acquittal on sufficiency of the evidence grounds, which included the argument that there was insufficient evidence to prove the requisite nexus to interstate commerce under the federal arson statute.[2] On appeal, he raises new arguments based on the Supreme Court's decision in *United States v. López*, — U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), which struck down the Gun Free School Zone Act, 18 U.S.C. § 922(q), as exceeding Congress' authority under the Commerce Clause[3] to regulate interstate commerce. Appellant now argues that, in light of *López*, the federal arson statute is unconstitutional and that, accordingly, the district court lacked subject matter jurisdiction. In the alternative, Appellant argues that under *López* there is insufficient evidence to prove that the Galleria II was a building that "substantially affected" interstate commerce.

Specifically, Appellant now claims that this is a simple state arson case which Congress has no power under the Commerce Clause to federalize and thereby undercut Massachusetts' power to prosecute Appellant under its own arson statute, Mass.Gen.Laws Ann. ch. 266, § 1. In support of this argument, Appellant insists that *López* effectively over-

---

**2.** The federal arson statute provides:
Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce ... [is guilty of a crime].

18 U.S.C. § 844(i) (1994).

**3.** Under the Commerce Clause, Congress is empowered "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3.

ruled the Supreme Court's earlier decision in *Russell v. United States*, 471 U.S. 858, 859, 105 S.Ct. 2455, 2456, 85 L.Ed.2d 829 (1985), which concluded that the federal arson statute expresses Congressional intent to exercise its full power under the Commerce Clause. *Id.* (holding that rental property was property used in an activity affecting interstate commerce within the meaning of the federal arson statute). Consequently, Appellant challenges the "continuing viability" of *United States v. Medeiros*, 897 F.2d 13 (1st Cir.1990), in which we held that after *Russell* rental property is *per se* "unquestionably sufficiently connected to interstate commerce to confer jurisdiction" and satisfy the jurisdictional element of the federal arson statute. *Id.* at 16–17. Appellant, thus, urges us to reexamine our holding in *Medeiros* in light of *López'* "substantially affect" nexus requirement between the illegal activity and interstate commerce, and reverse his convictions on the grounds that the evidence does not prove that the attempted arson of the Galleria II "substantially affects" interstate commerce.

### A. The Constitutionality of Section 844(i)

#### 1. Standard of Review

 Although Appellant failed to raise his *López*-based challenge below,[4] a claim that a statute is unconstitutional or that the court lacked jurisdiction may be raised for the first time on appeal. *United States v. Seuss*, 474 F.2d 385, 387 n. 2 (1st Cir.), *cert. denied*, 412 U.S. 928, 93 S.Ct. 2751, 37 L.Ed.2d 155 (1973); *see also*, Fed.R.Crim.P. 12(b)(2) (lack of jurisdiction may be noticed by the court at any time). We review a determination of the constitutionality of a federal statute *de novo*. *See United States v. Díaz–Martínez*, 71 F.3d 946, 953 (1st Cir. 1995) (applying, without explicitly stating so,

de novo review to *López*-based constitutional challenge not raised during pre-*López* proceedings); *United States v. Sherlin*, 67 F.3d 1208, 1213–14 (6th Cir.1995) (applying *de novo* review to *López*-based constitutional challenge to the federal arson statute), *cert. denied*, —— U.S. ——, 116 S.Ct. 795, 133 L.Ed.2d 744 (1996); *United States v. Aguilar–Aranceta*, 957 F.2d 18, 21 (1st Cir.1992) (reviewing *de novo* questions of constitutional law). *But see United States v. Spires*, 79 F.3d 464, 465 (5th Cir.1996) (reviewing only for plain error *López*-based constitutional challenge not raised below during pre-*López* proceedings); *United States v. Dupaquier*, 74 F.3d 615, 619 (5th Cir.1996) (same); *Daigle v. Maine Medical Center, Inc.*, 14 F.3d 684, 687–88 (1st Cir.1994) ("The raise-or-waive rule applies with full force to constitutional challenges."). Regardless of what standard of review we apply, the result is the same since even under the more favorable *de novo* standard, we reject Appellant's constitutional and jurisdictional challenges, finding that *López* in no way provides grounds for reversal in this case.

#### 2. Discussion

 As with the federal arson statute at issue here, Congress has often invoked its authority under the Commerce Clause to federalize criminal activity. Appellant points to *López* and its invalidation of the Gun Free School Zone Act[5] as evidence that the Supreme Court's present position is to restrictively interpret the Commerce Clause when it is used as a foundation for a criminal statute. *See López*, —— U.S. at —— n. 3, 115 S.Ct. at 1631 n. 3 ("Under our federal system, the 'States possess primary authority for defining and enforcing the federal law.'" (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 635, 113 S.Ct. 1710, 1720, 123 L.Ed.2d 353 (1993))). The *López* Court recognized

---

4. Appellant did not make these *López*-based arguments below as *López* had not yet been decided. We note that Appellant does not argue that we must consider *López* even though rendered after his trial because it establishes a new rule for criminal prosecutions and must be applied retroactively. *See Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987); *United States v. Melvin*, 27 F.3d 703, 707 n. 4 (1st Cir.1994). We need not address this issue, or

decide whether this case falls within *Griffith*, because, regardless of waiver, Appellant does not prevail on the merits.

5. This Act made it a federal offense to knowingly possess a firearm at a place that the individual knows or has reasonable cause to believe is a school zone.

three categories of activity which Congress may regulate under the Commerce Clause: (i) "the use of the channels of interstate commerce"; (ii) "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities"; and (iii) "those activities that substantially affect interstate commerce." *López*, — U.S. at —–—, 115 S.Ct. at 1629–30.

■ After *López*, the Court explained in *United States v. Robertson*, — U.S. —, 115 S.Ct. 1732, 131 L.Ed.2d 714 (1995) (per curiam), that these three bases of congressional authority are analytically distinct, reaffirming the distinction between activities engaged in interstate commerce and purely intrastate activities having a substantial effect on interstate commerce. *See Robertson*, — U.S. at —, 115 S.Ct. at 1733. The Court stated that the "'affecting commerce' test was developed in our jurisprudence to define the extent of Congress' power over purely *intra* state commercial activities that nonetheless have substantial *inter* state effects." *Id.* at —, 115 S.Ct. at 1733 (emphasis in original) (concluding that transporting equipment and workers from out of state fell within 18 U.S.C. § 1962(a)'s alternative criterion without regard to the "affecting commerce" test).

■ We consider the federal arson statute and the Court's pre-*López* holding in *Russell* in light of this framework, concluding that *López* does not invalidate 18 U.S.C. § 844(i). First, by its plain language, Section 844(i) clearly falls under both the second and third *López* categories in that it protects property that is either "used *in* interstate or foreign commerce or *in any activity* affecting interstate or foreign commerce." 18 U.S.C. § 844(i) (emphasis added).

■ Second, the federal arson statute contains the requisite "jurisdictional element" and thus is readily distinguishable from the provision invalidated in *López*. As we recently noted in *Díaz–Martínez*, the Supreme Court in *López* "found significant that the statute in that case, 18 U.S.C. § 922(q) [the federal firearms possession statute], 'contain[ed] no jurisdictional element which

would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce.'" *Díaz–Martínez*, 71 F.3d at 953 (quoting *López*, — U.S. at —, 115 S.Ct. at 1631). We held that, unlike *López*, the jurisdictional element was present in 18 U.S.C. § 922(k) because it contains a specific requirement that the firearm with the obliterated serial number have been "shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(k); *Díaz–Martínez*, 71 F.3d at 953 (holding that "[w]hatever the reach of *López*, it does not invalidate 18 U.S.C. § 922(k)"). Here, too, the federal arson statute contains the requisite jurisdictional element which similarly ensures that, case-by-case, the property damaged by the arson must have been "used in interstate ... commerce or in an activity affecting interstate ... commerce." 18 U.S.C. § 844(i).

■ Third, while the federal arson statute is similar to that struck down in *López* in that it does not regulate commercial or economic activity, *see United States v. Pappadopoulos*, 64 F.3d 522, 526–27 (9th Cir.1995), it does regulate the damage or destruction of business property that satisfies the requisite interstate nexus, *see Russell*, 471 U.S. at 860–62, 105 S.Ct. at 2457 ("Congress at least intended to protect all business property"); *United States v. Flaherty*, 76 F.3d 967, 974 (8th Cir.1996). Particularly in the absence of any mention of *Russell* in the majority opinion of *López*, we can find no reason to conclude that *López* invalidates *Russell*'s analysis of Section 844(i)'s purpose and legislative history or its conclusion that the federal arson statute constitutionally regulates arson of business property that satisfies the requisite jurisdictional element. *Russell*, 471 U.S. at 860–62, 105 S.Ct. at 2456–58. After all, whatever *López*' reach, it certainly did not purport to overrule cases upholding application of the Commerce Clause power to wholly intrastate activities satisfying the requisite nexus to interstate commerce. *See United States v. Genao*, 79 F.3d 1333, 1336 (2d Cir. 1996).

■ Furthermore, we reject Appellant's argument that Section 844(i) is unconstitutional because it improperly intrudes into

Massachusetts' primary authority for defining and enforcing the criminal law. By virtue of the fact that the federal arson statute is a criminal law it indeed intrudes upon states' traditional dominion over the criminal law. *López,* —— U.S. at —— n. 3, 115 S.Ct. at 1631 n. 3 ("Under our federal system, the 'States possess primary authority for defining and enforcing the criminal law.'" (quoting *Abrahamson,* 507 U.S. at 635, 113 S.Ct. at 1720)). However, "not every federal foray into criminal law is invalid." *United States v. Bishop,* 66 F.3d 569, 584 (3d Cir.1995) (rejecting *López*-based challenge to the constitutionality of the federal carjacking statute, 18 U.S.C. § 2119). Where, as here, the criminal statute satisfies the constitutional limits of the Commerce Clause, it withstands the challenge that it interferes with the states' ability to define and enforce the criminal law. *See Russell,* 471 U.S. at 860–62, 105 S.Ct. at 2456–58. Finally, we note that we join our fellow circuits in arriving at the conclusion that 18 U.S.C. § 844(i) passes constitutional muster under *López. See, e.g., Flaherty,* 76 F.3d at 974; *United States v. Denalli,* 73 F.3d 328, 329 (11th Cir.1996); *Sherlin,* 67 F.3d at 1213–14; *Pappadopoulos,* 64 F.3d at 526.

Because we find no basis to question the presumed validity of 18 U.S.C. § 844(i), we conclude that the district court properly had subject-matter jurisdiction conferred by virtue of the fact that Appellant was charged with an "offense against the United States." 18 U.S.C. § 3231. *See United States v. Ryan,* 41 F.3d 361, 363–64 (8th Cir.1994) (noting that "if [the jurisdictional] element is not satisfied, then [defendant] is not guilty; but the court is not by the failure of proof on that element deprived of judicial jurisdiction.").

### B. Sufficiency of the Evidence

■ With respect to Appellant's claim that there was insufficient evidence to sustain his convictions, Appellant "faces an uphill climb," *United States v. Valle,* 72 F.3d 210, 216 (1st Cir.1995). "If the evidence presented, taken in the light most agreeable to the government, is adequate to permit a rational jury to find each essential element of the offense of conviction beyond a reasonable doubt, then [Appellant's] claim fails." *Id.* (citations omitted). As the district court's disposition of a motion for judgment of acquittal is subject to *de novo* review, we, "like the trial court, must 'scrutinize the evidence in the light most compatible with the verdict, resolve all credibility disputes in the verdict's favor, and then reach a judgment whether a rational jury could find guilt beyond a reasonable doubt.'" *Id.* (quoting *United States v. Taylor,* 54 F.3d 967, 974 (1st Cir.1995)).

■ After thoroughly reviewing the record[6] and applying these straightforward rules, we are convinced that a rational jury could have found beyond a reasonable doubt that the government had successfully proved each of the elements—including, as we discuss more thoroughly below, the requisite nexus to interstate commerce—of both Appellant's attempt and conspiracy convictions. Credibility determinations are uniquely within the jury's province; and, we defer to their determinations and the verdict if the evidence can support varying inferences. *See, e.g., United States v. Cruz–Kuilan,* 75 F.3d 59, 62 (1st Cir.1996); *United States v. González–Torres,* 980 F.2d 788, 790 (1st Cir. 1992). Here, the record clearly supports the verdict. That the jury chose to believe the testimony presented by the government, particularly that of Schaller, and disbelieve that presented by the defense was well within its province.

■ As part of our sufficiency of the evidence review, we must determine whether the requisite jurisdictional element is met. Because it constitutes a jurisdictional predicate of the substantive offense, this "jurisdictional element," like other elements of the offense, must be proved to the jury beyond a reasonable doubt. *See Pappadopoulos,* 64 F.3d at 524; *Medeiros,* 897 F.2d at 15–17 (stating that the government need only show a *de minimis* connection to interstate commerce in order to satisfy this element). Thus, in order for Appellant to be found

---

**6.** We included in our review of the record the challenged tape recordings because, as we explain below, we find that they were properly admitted into evidence.

guilty under the federal arson statute, the government had to prove, among other things, that the property was either "used in" or "used in an activity affecting" interstate commerce. 18 U.S.C. § 844(i). This involves identifying for what activity or purpose the building is "used." *Cf. Medeiros*, 897 F.2d at 16 (focusing on the character of a fictitious building in determining whether it was sufficiently connected to interstate commerce).

■ On appeal, Appellant argues that there is insufficient evidence to prove that the Galleria II was a building used in or affecting interstate commerce, because under *López* the evidence does not prove that the building "substantially affects" interstate commerce. Because Appellant did not raise this *López* argument below, we review only for plain error the district court's ruling on the sufficiency of the evidence regarding the jurisdictional element. *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993) ("There must be an 'error' that is 'plain' and that 'affect[s] substantial rights.'"); *United States v. Brand*, 80 F.3d 560, 567–68 (1st Cir.1996) (discussing *Olano* ).

We find no plain error. At the time of the district court's decision, *López* had not yet been decided and there was no reason for the district court to question the viability of *Russell* or *Medeiros*. Under *Medeiros*, the government need only show, and the jury need only find, a *de minimis* connection to interstate commerce in order to sustain a conviction under 18 U.S.C. § 844(i). *Medeiros*, 897

F.2d at 16–17. Here, the government presented uncontested evidence that the object of the attempted arsons was a "building" that was being "used" as a commercial establishment, the Galleria II restaurant. The jury was presented with evidence that Appellant and his partners rented the building; that the building was supplied with natural gas which traveled in interstate commerce; and that the restaurant received food supplies for its operation which traveled in interstate commerce. Indeed, Appellant conceded at oral argument that the building was used as a commercial establishment which received food supplies and natural gas for its operation that travelled in interstate commerce. The district court correctly instructed the jury that the government had to prove beyond a reasonable doubt that the Galleria II was property "used in or [sic] affected interstate or foreign commerce."[7] Viewing the evidence in the light most favorable to the jury verdict, this evidence more than satisfies *Medeiros'* *de minimis* requirement, and we therefore reject Appellant's insufficiency of the evidence argument.[8] *See, e.g., Ryan*, 41 F.3d at 364 (the *de minimis* standard "is easily met, even when the property is temporarily closed or vacant"); *U.S. v. Menzer*, 29 F.3d 1223, 1229 (7th Cir.) (finding interstate commerce connection where building used partly as commercial business received natural gas and items purchased for resale that moved in interstate commerce), *cert. denied*, —— U.S. ——, 115 S.Ct. 515, 130 L.Ed.2d 422 (1994); *Medeiros*, 897 F.2d at 16 (holding that rental property is *per se* prop-

7. The court further instructed the jury: "Interstate commerce means commerce or business between any place in one state and another place outside that state. It also means commerce between places within the same state, but passing through any place outside that state." Finally, the court stated: "Now, business-related property, as opposed to residential property, is considered used in or affecting interstate or foreign commerce even if it has only a *de minimis* affect [sic] on interstate or foreign commerce. For example, business-related property is considered used in or affecting interstate or foreign commerce if food or drink which has moved in interstate or foreign commerce is sold there, or if oil or gas which has moved in interstate or foreign commerce is used in the building." Appellant did not object to this instruction below or specifically challenge it on appeal.

8. We need not address Appellant's contention that our holding in *Medeiros* that the government need only show a *de minimis* connection to interstate commerce is invalidated by *López*. We merely note that while the *López* decision did not address the amount of evidence required to prove an explicit jurisdictional element of an offense, *see Flaherty*, 76 F.3d at 974, this does not necessarily mean that it is not controlling when determining how significant the connection to interstate commerce must be in order to satisfy the jurisdictional element, *see Denalli*, 73 F.3d at 330–31 (finding arson of private residence did not substantially affect interstate commerce); *Pappadopoulos*, 64 F.3d at 527 (same).

erty used in an activity affecting interstate commerce).

We only add this: Even assuming *López* requires more than a *de minimis* showing, we nonetheless find that the jury was presented with sufficient evidence to support its finding that the Galleria II was a building either "used in" or "used in an activity affecting" interstate commerce. Above, we found no reason to think that *López* in any way undercut *Russell*'s conclusion that Congress has the authority to regulate arson of business property.[9] Similarly, we find no basis to conclude that *López* in any way undercuts *Russell*'s holding that "rental property is unquestionably" an "activity" that affects interstate commerce within the meaning of 18 U.S.C. § 844(i). *Russell*, 471 U.S. at 862, 105 S.Ct. at 2457 ("We need not rely on the connection between the market for residential units and the 'interstate movement of people,' to recognize that the local rental of an apartment unit is merely an element of a much broader commercial market in rental properties." (quoting *McLain v. Real Estate Board of New Orleans*, 444 U.S. 232, 245, 100 S.Ct. 502, 510–11, 62 L.Ed.2d 441 (1980))); *cf. Sherlin*, 67 F.3d at 1213 (finding that building used in educational business of college was building used in an activity affecting interstate commerce). We, thus, reaffirm our holding in *Medeiros* that rental property is *per se* sufficiently connected to interstate commerce to confer federal jurisdiction under Section 844(i) and to satisfy the jurisdictional element. *See Medeiros*, 897 F.2d at 16. Because uncontested evidence was presented that, at the time of the attempted fires, Appellant and his partner rented the building in which the Galleria II was operated, the jury was presented with sufficient evidence to find that the building was "used in an activity affecting" interstate commerce within the meaning of 18 U.S.C. § 844(i)'s second category.

Even assuming further that *López* undermines *Russell* and *Medeiros*' holding

regarding rental property, we would nonetheless affirm the jury's finding. Because uncontested evidence was presented below that the building was used as a commercial establishment which received food supplies and natural gas for its operation that travelled in interstate commerce, the Galleria II also falls within 18 U.S.C. § 844(i)'s "real or personal property used in interstate . . . commerce." Because the Galleria II was property *used in* interstate commerce, we need not address whether its activities "substantially affect[ed]" interstate commerce. *Cf. Robertson*, — U.S. at —, 115 S.Ct. at 1733.

In sum, because we are convinced that a rational jury could have found beyond a reasonable doubt that the government had successfully proved each of the elements, we affirm the district court's denial of Appellant's motions for acquittal.

## II. Appellant's Motion for Mistrial

Appellant also appeals the denial of his motion for a mistrial on the grounds that improper testimony was prejudicial. We review the district court's decision for abuse of discretion. *United States v. Rivera–Gómez*, 67 F.3d 993, 998 (1st Cir.1995) ("The trial judge is best situated to make a battlefield assessment of the impact that a particular piece of improper information may have on a jury."); *United States v. Sepúlveda*, 15 F.3d 1161, 1184 (1st Cir.1993) ("Granting or denying a motion for mistrial is a matter committed to the trial court's discretion."), *cert. denied*, — U.S. —, 114 S.Ct. 2714, 129 L.Ed.2d 840 (1994).

Appellant argues that the district court abused its discretion when it denied his motion for a mistrial which he made after Schaller testified that Appellant owned "a gay night club." The trial transcript shows that Schaller testified on direct as follows:

Q: Now, in the beginning of the restaurant when it first opened, how often did you speak with the defendant about the Galleria II Restaurant?

A: On a daily basis.

**9.** *See generally*, Thomas J. Egan, Note, The Jurisdictional Element of 18 U.S.C. 844(i), A Federal Criminal Commerce Clause Statute, 48 Wash. U.J.Urb. & Contemp.L. 183, 208 (1995) (noting that "the controversy of § 844(i) jurisdiction boils down to one issue—*in addition to business property*, what types of private property trigger federal jurisdiction in arson cases?") (emphasis added).

Q: When you say "daily basis," was that on the phone or in person?

A: Usually in person.

Q: Where was that?

A: At the club that he owns in Providence, Gerardo's.

Q: What type of club is that?

A: A gay night club.

(Transcript, Vol. 4 at 98–99). At this point, Appellant objected to the comment and moved for a mistrial on the grounds that the "comment was completely gratuitous ... [a]nd it was designed specifically to, solely to[,] inflame the passions and prejudice of this jury." (Transcript, Vol. 4 at 99).

Although the court seemed to agree with the government that the information was offered as "strictly background information," the court was nonetheless concerned about the possibility that some jurors "may have a view that someone who runs a gay bar may not be an upstanding citizen." (Transcript, Vol. 4 at 99–100). The court decided to speak with the jurors individually to ascertain (i) whether the juror was affected by the testimony in any way; (ii) whether the juror would remain impartial; and (iii) whether the juror would be able to render a verdict based on the evidence and the law as instructed by the court, without regard to the fact that Appellant operated a gay night club. After every juror responded that he or she would not be affected by the testimony in rendering his or her verdict, (Transcript, Vol. 4 at 101–12), the court concluded, "All right. I'm satisfied." (Transcript, Vol. 4 at 113). At this point, and without further comment by counsel, testimony resumed. At the end of trial, Appellant did not request any additional questions be asked of the jurors or that any additional instructions be given.

 Based on the record, and under the guiding principle that a district court may declare a mistrial only as a "last re-

sort," *Sepúlveda,* 15 F.3d at 1184, we find that the district court's decision "was well within the broad range of its discretion." *Rivera–Gómez,* 67 F.3d at 999. The district court properly weighed the claim of impropriety and determined that it was unfounded based on his voir dire of the jurors. *United States v. Hahn,* 17 F.3d 502, 508 (1st Cir.1994) ("A mistrial need not be allowed absent a clear showing of prejudice."). Moreover, the district court acted swiftly by polling the jurors immediately after the improper testimony.[10] *Sepúlveda,* 15 F.3d at 1185 ("Swiftness in judicial response is an important element in alleviating prejudice once the jury has been exposed to improper testimony."). The government argues that this polling effectively provided a curative instruction that the jurors were not to consider evidence that Appellant operated a gay night club in determining guilt or innocence. Given the questions asked and the responses received, we agree that the district court "efficaciously dispelled" any prejudicial effect of Schaller's statement by its immediate and thorough response. *See United States v. Bello–Pérez,* 977 F.2d 664, 672 (1st Cir.1992) (affirming denial of motion for mistrial where "[a]ny prejudicial effect of the remark was efficaciously dispelled"). Finally, given the overwhelming evidence of guilt presented during the trial, the challenged testimony was innocuous. *Bello–Pérez,* 977 F.2d at 672 (denying mistrial where evidence of guilt was overwhelming).

### III. Appellant's Motion for a New Trial and Motion *in Limine*

 Third, Appellant appeals the denial of his motion for a new trial, arguing that the district court abused its discretion in denying his motion *in limine*[11] to exclude from evidence four tapes of recorded conversations between himself and Schaller in February,

---

10. In deciding when to "instruct the jurors," the court noted that "[t]he question is should we go on now, or should I [speak to the jurors] at this point?" Appellant responded that "I think I should know the answer. It makes sense to us, doesn't it?" The court agreed and spoke individually with each of the jurors at that time. (Transcript, 4–101).

11. When the tapes were admitted into evidence, Appellant reiterated his objections to the admissibility of the tapes, which he first had raised in his motion *in limine. See* Transcript, Vol. 5 at 48. Thus, we find the present claim properly preserved for appeal.

March and May 1994. As the motion for a new trial is not properly before us on appeal,[12] we only address Appellant's motion *in limine*.[13] Appellant argued below, as he does now, that the tapes should have been excluded in their entirety from evidence because (i) their probative value was substantially outweighed by their prejudicial effect under Fed.R.Evid. 403, even after certain portions were redacted; (ii) they were improperly admitted as evidence of "other crimes, wrongs, or acts" under Fed.R.Evid. 404(b); and (iii) portions of them were partially or wholly unintelligible which thereby rendered them more misleading than helpful.[14]

Here, the court listened to the four tapes, reviewed their respective transcripts, and heard arguments of counsel on the admissibility of both the tapes and the transcripts. In denying Appellant's motion *in limine* to exclude the tapes in their entirety under Fed.R.Evid. 403 and 404(b), the district court found that they were admissible as probative of the issues raised in the case and that they were "overall more relevant" than prejudicial. (Transcript, Vol. 2 at 12–13). The district court, however, did allow Appellant to make specific objections of undue prejudice. (Transcript, Vol. 2 at 13–15). After hearing argument from counsel, (Transcript, Vol. 4 at 4–47), the district court agreed with most of Appellant's specific objections and excluded

those portions. With respect to Appellant's audibility argument, the district court only found the March 1, 1994, tape troubling in that it "seems ... just woefully inadequate for any reasonable person to understand." (Transcript, Vol. 2–17). The district court's concern was that the only way to understand the tape was to read the transcript which resulted in the transcript—and the Government's view—being given too much weight. After considering alternatives and hearing arguments from counsel, the district court decided to admit the tape and allow the transcript because both parties had stipulated to the accuracy of the transcript as a true rendition of the recording. (Transcript, Vol. 2 at 4; Vol. 4 at 4). Finally, the district court gave cautionary instructions to the jury that the tapes were evidence but that the transcripts were not. The district court also ruled that the transcripts would not be permitted during deliberations.[15] (Transcript, Vol. 4 at 4–5).

We turn to Appellant's arguments, reviewing the district court's decision to admit or exclude evidence under Fed.R.Evid. 403 and 404(b) for abuse of discretion. *See, e.g., United States v. Frankhauser*, 80 F.3d 641, 648 (1st Cir.1996); *United States v. Cruz–Kuilan*, 75 F.3d 59, 61 (1st Cir.1996). The same standard of review applies regarding the district court's decision to admit the

---

12. On February 24, 1995,—fourteen days after the guilty verdict was rendered—Appellant filed a motion for a new trial and to extend time to file supporting memorandum. The district court denied both motions on the grounds that they were not timely filed pursuant to Fed.R.Crim.P. 33 (providing, *inter alia*, seven-day filing period from the guilty verdict, or such time as the court may fix during the seven-day period, "unless based on the ground of newly discovered evidence" in which event it may be filed within two years after final judgment) and Fed.R.Crim.P. 45(b) (providing that the court may not extend the time for any action under, *inter alia*, Fed. R.Crim.P. 33). Because Appellant's motion was not timely filed below, and because his arguments on appeal do not involve "newly discovered evidence," we do not address this motion. As we have held before, Fed.R.Crim.P. 33 is jurisdictional and the district court is without discretion to grant a motion for a new trial that is not timely filed. *See, e.g., United States v. Rogers*, 41 F.3d 25, 34 (1st Cir.1994); *United States v. Lema*, 909 F.2d 561, 565 (1st Cir.1990).

13. We note that distinguishing these two motions is somewhat meaningless—as a practical matter—within the context of this case, given that the same abuse-of-discretion standard applies to both motions and that Appellant's sole argument regarding the motion for a new trial is that the court abused its discretion in denying the motion *in limine*.

14. In his motion *in limine*, Appellant also sought exclusion on the grounds that portions contained inadmissible hearsay under Fed.R.Evid. 802. Appellant does not make this argument on appeal. We assume the reason for this is that, as the record shows, those portions to which Appellant objected on hearsay grounds were excised from the recordings by agreement of the parties and the court. In any event, as this argument is not properly raised on appeal, we do not address it.

15. We note that Appellant does not challenge on appeal the use of the transcripts.

tapes over Appellant's audibility argument. *See United States v. Jadusingh,* 12 F.3d 1162, 1167 (1st Cir.1994) ("As we have held on numerous occasions, a trial judge's ruling on the admission of recordings is afforded 'broad discretion,' even where portions of the taped conversation are unintelligible.").

### A. The Tapes' Relevancy

Evidence is excludable under Fed.R.Evid. 403 "if its probative value is substantially outweighed by the danger of unfair prejudice." [16] After reviewing the transcript,[17] we find no abuse of discretion in the district court's decision to not exclude the tapes in their entirety. In support of his argument, Appellant claims that (i) none of Appellant's statements prove any element of the alleged crimes or show consciousness of guilt; (ii) the recorded conversations took place two years after the predicate offenses occurred; (iii) many of Appellant's arguments were made in response to questions instigated by the government witness; and, (iv) any relevant conversations were intertwined with others that were not relevant. We find none of these arguments persuasive.

As the district court found, the tapes included highly probative evidence regarding Appellant's consciousness of guilt, including admissions. The tapes were directly relevant to the government's theory regarding both Appellant's involvement in the attempted arson and the conspiracy. Indeed, we note that Appellant's counsel conceded as much during the hearing on the tapes' admissibility: "I concede, Judge, that there were parts that, given the Government's position and its interpretation, are relevant." (Transcript, Vol. 2 at 12).

For example, the February 24, 1994, tape includes a conversation regarding the payment of Schaller's legal fees. Not only did it corroborate Schaller's testimony that Appellant assisted in the payment of Schaller's legal fees, this conversation included evidence from which the jury could draw an inference "that this money is being paid because these gentlemen were in on the deal together." (Transcript, Vol. 4 at 9). The March 1, 1994, tape includes an admission by Appellant that he threw matches to light the fire during the first attempt: "You weren't there when I threw the [expletive] matches the first time." The March 4, 1994, tape includes an adoptive admission by Appellant regarding his attempts to burn the restaurant during a conversation about whether Appellant had told anyone about those efforts. While Appellant denies telling anybody else about his efforts, he responds to Schaller's questions directly without ever disputing the veracity of what Schaller's questions imply—that Appellant "tried to burn it." The May 25, 1994, tape provides evidence of the conspiracy between Schaller and Appellant. The conversation demonstrates that, although they were confused as to their recollection of what they believed to be their respective roles, they clearly had conspired to burn the restaurant. This sampling of each of the four tapes clearly shows that, contrary to Appellant's claims, the recordings include statements by Appellant that are directly probative of both attempts and the conspiracy.

Appellant also points to the fact that the recorded conversations occurred two years after the alleged offenses, arguing that the recordings are neither closely intertwined with the charged offenses nor helpful in establishing Appellant's intent to commit the crimes charged. Appellant cites to three cases addressing the admissibility of evidence under Fed.R.Evid. 404(b). *See United States v. Huff,* 959 F.2d 731, 736 (8th Cir. 1992); *United States v. Brookins,* 919 F.2d 281, 286 (5th Cir.1990); *United States v. Hodges,* 770 F.2d 1475, 1480 n. 4 (9th Cir. 1985). We agree with these cases that proximity in time is a factor to be considered in

---

16. Fed.R.Evid. 403 provides in pertinent part: Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

17. Because the parties stipulated to the accuracy of the transcripts as true recordings of the tapes, we do not need to actually listen to the tapes. In any event, we note that they were not made part of the district court record nor included as part of the record on appeal.

determining relevancy under Fed.R.Evid. 404(b) of "other crimes, wrongs, or acts." *See, e.g., United States v. Fields,* 871 F.2d 188, 197 (1st Cir.1989) ("Probative value must be considered in light of the remoteness in time of the other act and the degree of the resemblance to the crime charged."); *United States v. Currier,* 836 F.2d 11, 17 (1st Cir. 1987) (noting that the prior bad acts were both close in time and in nature to the crime charged).[18] In addition, Appellant also points out that the tapes here are distinguishable from those admitted in *Currier,* based on the fact that the recorded conversations in that case occurred immediately prior to and after the crime charged and were, thus, found to "help[ ] establish appellant's intent to commit the crime charged." *Id.* Because the conversations here occurred two years after the predicate offenses, Appellant contends that the tapes cannot be said to be so "closely intertwined" with the predicate offenses so as to help establish Appellant's intent to commit the crimes charged.

We are unswayed by Appellant's arguments. Here, as we discuss below, no evidence of prior bad acts was admitted in this case; and, because Appellant has not cited to any cases holding that proximity in time is a prerequisite for determining relevance under Fed.R.Evid. 403, and because we have not found any, we are unconvinced that the timing of the conversations is of any consequence or otherwise undermines their strong relevance. *See, e.g., United States v. Perkins,* 926 F.2d 1271, 1279–80 (1st Cir.1991) (finding no error in admission of post-conspiracy statements made to a government informant where court found statements were an admission corroborating trial testimony and reflected complicity and consciousness of guilt). Even assuming, *arguendo,* that proximity must be considered in determining relevance, we nonetheless find that even though the conversations occur two

years after the attempt and conspiracy, they are "closely intertwined with the charged offense[s] ... [and] provid[e] ... significant contextual material" for the jury. *Currier,* 836 F.2d at 17 (citations omitted). As discussed above, while they do not necessarily show Appellant's *intent* to commit the attempted arson or to enter into a conspiracy, they do show Appellant's consciousness of guilt and complicity as well as the existence of a conspiracy. *See Perkins,* 926 F.2d at 1279–80.

■ While not all evidence with probative value is admissible, we do not find that its value is "substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403. In reviewing the balancing undertaken by the district court, we give great deference to the district court's judgment, and "[o]nly in exceptional circumstances will we reverse the exercise of a district court's informed discretion vis-à-vis the relative weighing of probative value and unfairly prejudicial effect." *Currier,* 836 F.2d at 18 (quoting *United States v. Griffin,* 818 F.2d 97, 101–02 (1st Cir.), *cert. denied,* 484 U.S. 844, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987)). Based on our review of the record, we do not find that the probative value of the tapes—as edited [19]— was outweighed by unfairly prejudicial evidence. *See, e.g., United States v. Muñoz,* 36 F.3d 1229, 1233 (1st Cir.1994) (noting that the question under Rule 403 is one of unfair prejudice, not prejudice alone); *Currier,* 836 F.2d at 18 ("Unfairly prejudicial evidence is evidence ... that 'triggers [the] mainsprings of human action [in such a way as to] cause the jury to base its decision on something other than the established proposition in the case.'") (quoting 1 Weinstein's Evidence § 403[03], 36–39 (1986)). Neither the fact that many of Appellant's remarks were made in response to questions or comments by the government witness, nor that relevant con-

---

18. The defendant in *Currier* objected to the tape at trial on the basis of Fed.R.Evid. 403. Reasoning that "because the same revelations of 'skullduggery' that formed the basis for his assertion that the tape was unfairly prejudicial could also have formed the basis for an additional assertion that the tape was offered only to show his bad character," we held that defendant's Rule 403 objection was sufficient to preserve a claim of

error under Rule 404(b), noting that the two "usually ... go hand in glove." *Currier,* 836 F.2d at 17.

19. As mentioned above, after hearing arguments from counsel, the district court agreed to excise most of the portions regarding which Appellant raised specific objections.

versations were intertwined with non-relevant ones, persuades us to reach a different conclusion. Even the fact that the recordings reveal that Appellant had initially wanted to hire "a guy from organized crime so to speak" to burn the restaurant, (Transcript, Vol. 4 at 32), or that Appellant tells Schaller what to say about pouring the gasoline, (Transcript, Vol. 4 at 44), does not make them unfairly prejudicial. Finally, we do not find that any "exceptional circumstances"[20] exist which warrant reversal of the district court's rulings.[21]

### B. The Tapes' Prior Bad Act Evidence

We find Appellant's reliance on Fed. R.Evid. 404(b) to be irrelevant on appeal.[22] While the transcript of the pre-trial hearing regarding the admissibility of the tapes shows that there were references to previous fires which arguably fall within Fed.R.Evid. 404(b), the record shows that these references were excised by agreement of the parties. (Transcript, Vol. 4 at 21). Not only does Appellant not specify on appeal what "other crimes, wrongs, or acts" under Fed. R.Evid. 404(b) were erroneously admitted into evidence, we find no mention of any in the portions that were admitted into evidence. Accordingly, we do not address this argument further.

### C. The Tapes' Audibility

▇▇▇▇ Lastly, as to Appellant's audibility argument, in exercising its broad discretion in ruling on the admissibility of tape recordings, even where portions are unintelligible, *Font–Ramirez*, 944 F.2d at 47, the district court "must decide whether 'the inaudible parts are so substantial as to make the rest more misleading than helpful.'" *Id.* (citations omitted) (quoting *Gorin v. United States*, 313 F.2d 641, 652 (1st Cir.), *cert. denied*, 374 U.S. 829, 83 S.Ct. 1870, 10 L.Ed.2d 1052 (1963)). While the district court found that there were segments of poor audio and static, the district court nonetheless decided to admit them. The district court was swayed by the fact that the parties stipulated to the accuracy of the transcript as a true recording of the tapes.[23] We are similarly swayed and find no abuse of the court's broad discretion, even as to the March 1, 1994, tape about which the district court was most concerned. Based on our review of the transcript,[24] we disagree with Appellant's claim that the inaudible parts, when taken as a whole, were so substantial as to make the rest more misleading than helpful, because the transcript clearly evidences that sufficient portions of the tapes, including statements by both Schaller and Appellant, are audible. As discussed earlier, these segments are relevant because they include, *inter alia*, admissions by Appellant, tending to show consciousness of guilt and corroborate trial testimony. Furthermore, the district court gave a cautionary instruction to the jury that not only informed them that the tapes, but not the transcript, were evidence, but also that the jurors had to draw their own conclusions regarding their content and probative value based on what they themselves heard on the tapes.[25] *United*

---

**20.** We note that Appellant does not specify on appeal that any "exceptional circumstances" exist.

**21.** Because we find that the district court did not abuse its discretion, we need not decide whether the admission of the tape recordings—even if an error—was nonetheless harmless.

**22.** Fed.R.Evid. 404(b) provides in pertinent part: Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

**23.** Inaudible segments were indicated in the transcript with parentheticals, such as "static" or "unintelligible."

**24.** *See* n. 17, *supra.* In ruling on Appellant's audibility argument, we add only this: By not including the tapes in the record on appeal, Appellant forfeited the right to their review.

**25.** We also note that as to the one disputed sentence in the transcript (whether Appellant said "I am aware of that" or "I am not aware of that", (Transcript, Vol. 4 at 23)), the court allowed two versions of the page to be included in

*States v. Carbone,* 798 F.2d 21, 26 (1st Cir. 1986) (finding that the judge's handling of the transcript was in accord with the law where the record shows that the judge carefully instructed the jurors that the tapes, not the transcripts, were evidence and that any differences between the two must be resolved in favor of what was heard on the recording). Based on the record, and particularly in light of Appellant's stipulation to the accuracy of the transcript as a true recording of the tapes, we find no abuse of discretion by the district court in admitting the tapes over Appellant's audibility objection.

### IV. Appellant's Sentence

■ Finally, Appellant appeals his sentence imposed by the district court pursuant to the federal arson guidelines.[26] *See* U.S.S.G. § 2K1.4(a)(1)–(4). The arson guidelines provide, in pertinent part:

(a) Base Offense Level (Apply the Greatest):

(1) 24, if the offense (A) created a substantial risk of death or serious bodily injury to any person other than a participant in the offense, and that risk was created knowingly; . . .

(2) 20, if the offense (A) created a substantial risk of death or serious bodily injury to any person other than a participant in the offense; . . .

(3) 2 plus the offense level from § 2F1.1 (Fraud and Deceit) if the offense was committed in connection with a scheme to defraud; or

(4) 2 plus the offense level from § 2B1.3 (Property Damage or Destruction).

U.S.S.G. § 2K1.4; *see* U.S.S.G.App. C, Amendment 330 (restructuring the arson guidelines). New language in the Commentary, Application Note 2, provides that "[c]re-

ating a substantial risk of death or serious bodily injury includes creating that risk to firefighters and other emergency and law enforcement personnel who respond to or investigate an offense." *See, e.g., United States v. Turner,* 995 F.2d 1357, 1365 (6th Cir.1993) (finding that endangering firefighters is an appropriate factor); *United States v. Grimes,* 967 F.2d 1468, 1471 (10th Cir.), *cert. denied,* 506 U.S. 927, 113 S.Ct. 355, 121 L.Ed.2d 269 (1992) (noting that several other circuits had come to the same conclusion).

Appellant challenges the district court's sentence on three separate grounds. We address them in turn, reviewing findings of fact for clear error, mindful that they need only be supported by a preponderance of the evidence, and reviewing questions of law *de novo,* including the scope and applicability of a relevant guideline. *See* 18 U.S.C. § 3742(e); *United States v. Martínez-Martínez,* 69 F.3d 1215, 1224 (1st Cir.1995); *United States v. Thompson,* 32 F.3d 1, 4 (1st Cir.1994).

### A. The "Fraud or Deceit" Base Offense Level

■ First, Appellant contends that the district court should have applied U.S.S.G. § 2K1.4(a)(3), which requires computation of the base offense level as 2 plus the base offense level for "Fraud and Deceit." Appellant argues that the overwhelming evidence at trial established that his primary purpose was to defraud the insurance company and that Appellant, while creating some risk of death or serious bodily injury by pouring gasoline, did not knowingly create a substantial risk. While the record does indicate that Appellant participated in a scheme to defraud the insurance company, we conclude that the district court properly chose subparagraph § 2K1.4(a)(1) based on its specific

---

the transcript, informed the jury that the parties were in dispute as to what Appellant actually said on that page (without specifically identifying the disputed sentence), and gave another cautionary instruction that they were to make their own finding based on what they heard on the tapes. The jury heard that segment twice, each time while reading along with the respective versions. (Transcript, Vol. 5 at 54–59).

**26.** All citations to the Sentencing Guidelines are to the November 1994 version, which is the version applied by the district court, as it was the one in effect at the time of Appellant's May 25, 1995, sentencing. *See United States v. Aymelek,* 926 F.2d 64, 66 n. 1 (1st Cir.1991) (noting that district courts should apply the version of the Guidelines in effect at the time of sentencing, barring ex post facto problems). Here, the applicable guidelines had not changed after Appellant committed the instant offenses.

finding—which, as we discuss below, was not clearly erroneous—that Appellant knowingly created a substantial risk of death or serious bodily injury to persons other than the participants in the attempted arson. *See Grimes*, 967 F.2d at 1472 (holding that district court properly rejected application of fraud guideline, § 2K1.4(a)(3), and properly applied § 2K1.4(a)(2) in case involving defendant's effort to obtain insurance through arson where defendant created substantial risk of injury or death). The arson guideline instructs that the base offense level is determined by selecting the highest level from among four choices. Section 2K1.4(a)(1)–(4); *United States v. Mizrachi*, 48 F.3d 651, 655 (2d Cir.1995). The Government contends that applying § 2K1.4(a)(3) would only yield a base offense level of 19, less than that under § 2K1.4(a)(1), which is 24. Appellant does not dispute this calculation or otherwise present his own § 2K1.4(a)(3) calculation, nor was there any discussion of this issue during the sentencing hearing. Assuming, without deciding, that calculation under § 2K1.4(a)(3) would have yielded only a base offense level of 19, we conclude that the district court correctly applied § 2K1.4(a)(1) because it yielded the highest base offense level based on its finding that Appellant knowingly created a substantial risk of bodily injury. *Cf. Mizrachi*, 48 F.3d at 656 (affirming district court's application of § 2K1.4(a)(3) in sentencing defendant for arson, mail fraud, and money laundering offenses where facts yielded an initial base offense level of 35).

## B. Knowing Creation of a Substantial Risk

 Second, Appellant argues that the district court's finding that Appellant knowingly created a substantial risk of death or serious bodily injury to any person other than a participant in the offense is not supported by a preponderance of the evidence. Whether a defendant knowingly created a substantial risk of death or serious bodily injury within the meaning of section 2K1.4 of the Guidelines raises an issue of first impression in that this court has not previously determined what level of knowledge is required under § 2K1.4(a)(1)(A). At the outset, we note that this determination involves a two-step inquiry. A court must first ask whether the defendant's actions created a substantial risk of death or serious bodily injury and then decide whether the defendant acted knowingly in creating that risk. *See United States v. Karlic*, 997 F.2d 564, 568–69 (9th Cir.1993) (stating that the first inquiry is objective and the second is subjective).

### 1. The Substantial Risk ...

 Leaving aside the question of knowledge for the moment, we conclude first that the district court did not clearly err in finding that Appellant created a substantial risk of death or serious bodily injury to any person other than a participant in the offense. The district court based its finding primarily on the PSR, which indicated, *inter alia*, that the presence of gasoline created the potential for a fire or explosion. According to the PSR, a fuel air explosion could have occurred had "a heat source been introduced within a specific danger range between the place where the gasoline was poured and anyplace within the building where the odor of gasoline was detected," (PSR, at 22), and that "because the gasoline was poured in a confined area which contained electrical outlets, an electrical spark or other heat source could have ignited the vapors in the confined area at any time," (PSR, at 23). Although the evidence indicates that Appellant only planned to ignite the fire after the restaurant closed, the district court concluded that the potential for a fuel air explosion or for a fire to start accidentally created a substantial risk of death or serious bodily injury to the occupants of the building at the time of the pouring of the gasoline in the attic as well as to firefighters and others who would respond to the incident.

We find no clear error in this finding of substantial risk to patrons and firefighters. It was properly based on both the PSR and the sentencing judge's common sense understanding—which Appellant conceded during the sentencing hearing was appropriate—of the risks associated with pouring an accelerant to start a fire in an occupied building where there was the potential for a fuel air explosion to occur or for a fire to start acci-

dentally. *See Medeiros,* 897 F.2d at 20 (relying on common sense in finding under earlier arson guidelines that defendant conspired "to cause the kind of fire that recklessly would endanger others."). As the district court correctly noted in response to Appellant's insistence that there was no risk created because no fire actually occurred, (Sentencing Transcript, pages 19–22), the Guidelines speak of "risk." "The fact that fortuitously no one was injured and extensive damage did not result [because no fire or explosion actually occurred] does not further [A]ppellant's contention that he did not . . . create a substantial risk of death or serious bodily injury." *United States v. Honeycutt,* 8 F.3d 785, 787 (11th Cir.1993).

Furthermore, in light of the federal arson guidelines' commentary, *see* U.S.S.G. § 2K1.4, Application Note 2, we find no clear error in the district court's finding of substantial risk given its finding that firefighters "could have been blown to smithereens" had a spark ignited the gasoline vapors (Sentencing Transcript, at 20). *See, e.g., Turner,* 995 F.2d at 1365; *Grimes,* 967 F.2d at 1471. While "all fires present some danger to firefighters required to extinguish ·it, . . . [w]here a spectacular fire is planned near an occupied building, a finding of reckless endangerment to firefighters would be based on a common sense understanding of the risks of putting out a major fire when rescue attempts are likely to be necessary." *Medeiros,* 897 F.2d at 20. Similarly, here, although there is no evidence that Appellant planned a "spectacular fire," the sentencing judge's finding of substantial risk in this case was based on his—and, again, our—common sense understanding of the risks associated with using an accelerant in an occupied building to start a fire where there was the poten-

tial for a fuel air explosion to occur or for a fire to start accidentally.[27]

### 2. . . . Knowingly Created

Next, we must decide whether the district court clearly erred when it found that Appellant *knowingly* created this substantial risk. While we review the court's factual finding for clear error, the definition of a Guidelines term is a question of law which we review *de novo. Martinez–Martinez,* 69 F.3d at 1224.

■ Looking first to the statute, we note that the two highest base offense levels in the federal arson guidelines, § 2K1.4(a)(1) and § 2K1.4(a)(2), contain almost identical language. The latter, for which there is a base offense level of 20, applies to the creation of a substantial risk of death or serious bodily injury. The former, for which there is a base offense level of 24, applies to the knowing creation of such a risk. This structure clearly suggests that there must be a meaningful distinction between the two sections. *See Honeycutt,* 8 F.3d at 787 (noting that "[c]learly it was intended for there to be a distinction between the two sections").[28] Given the structure of the arson guidelines, we conclude that § 2K1.4(a)(1)(A) requires that the district court make a specific finding that the defendant "knowingly" created a substantial risk of death or serious bodily injury, as opposed to merely finding that defendant recklessly (or negligently) created such a risk which would more appropriately trigger application of § 2K1.4(a)(1)(B). Apart from this rather straightforward observation, no guidance is gleaned from the Sentencing Guidelines, as "knowingly" is not defined. In addition, the usual rule of giving an undefined statutory term its plain meaning provides little direction given that

---

27. In *Medeiros,* we affirmed the district court's finding of "reckless endangerment" under the earlier arson guidelines. We consider the facts supporting such a finding to be relevant to a finding of "substantial risk" under the amended guidelines.

28. In discussing § 2K1.4's application note about firefighters, the *Honeycutt* court concluded that knowledge alone that firefighters will respond to a fire "cannot suffice to satisfy § 2K1.4(a)(1)." The court reasoned that if that knowledge were alone sufficient then

§ 2K1.4(a)(2) (creation of a substantial risk of death or serious bodily injury) would be subsumed by § 2K1.4(a)(1) (knowing creation of that risk). As the court noted, "fires are inherently dangerous, and the knowledge that firefighters and emergency personnel respond to virtually all fires can ordinarily be presumed." *Honeycutt,* 8 F.3d at 787. "The arsonist must know that a specific fire for some reason poses a substantial risk of death or serious bodily injury to firefighters and emergency personnel who may respond." *Id.*

"'[k]nowledge' means different things in different contexts." *United States v. Spinney,* 65 F.3d 231, 236 (1st Cir.1995).

Our own precedent is of little help because, while this court has addressed the application of the federal arson guidelines, *see Medeiros,* 897 F.2d at 18 (applying former U.S.S.G. § 2K1.4(b)(2) and affirming district court's finding that defendant "recklessly endangered the safety of another"); *see also, United States v. Flowers,* 995 F.2d 315, 316 (1st Cir.1993) (involving but not discussing application of § 2K1.4); *United States v. Johnson,* 952 F.2d 565, 585 (1st Cir.1991) (same), it has never addressed what level of knowledge is required under the highest offense level where the substantial risk was created knowingly by the defendant.

Turning to our fellow circuits, we note that the Ninth Circuit, and later the Eleventh Circuit, adopted the definition of "knowingly" as used in the Model Penal Code (the "MPC") when applying § 2K1.4. *See Honeycutt,* 8 F.3d at 787; *United States v. Karlic,* 997 F.2d 564, 569 (9th Cir.1993). Drawing from the MPC's definition,[29] the Ninth Circuit held that "a defendant can be found to have 'knowingly' created a substantial risk of death or serious bodily injury under § 2K1.4 only if the defendant was aware that a substantial risk of death or serious bodily injury was 'practically certain' to result from the criminal act." *Karlic,* 997 F.2d at 569; *accord, Honeycutt,* 8 F.3d at 787. We note that other courts have neither explicitly defined "knowingly" nor adopted the MPC's definition, apparently finding it unnecessary where the district court could clearly conclude from the facts whether the defendant knew his actions created a substantial risk of death or serious bodily injury. For example, in *United States v. Markum,* 4 F.3d 891 (10th Cir.1993), the court found that a fire set with gasoline during business hours which put firefighters in severe jeopardy because of the ferocity of the fire and the risk of explosion constituted "circumstances [which] more than justified the district court's finding that [defendant], as a co-conspirator, knowingly created a substantial risk of death or serious bodily injury." *Id.* at 896–97. Similarly, in *United States v. Turner,* 995 F.2d 1357 (6th Cir.), *cert. denied,* 510 U.S. 904, 114 S.Ct. 282, 126 L.Ed.2d 232 (1993), the district court concluded that defendant's actions could fit under either § 2K1.4(a)(1)(A) or (B). As to the defendant's knowledge, the court found that defendant knowingly created the substantial risk given that people in the residence adjacent to the burning building were likely to be asleep and windy conditions would cause the fire to spread quickly. *Id.* at 1365. The court in *Turner* also found that defendant "should have known" that he was placing firefighters at a substantial risk by committing the arson in weather conditions that would make extinguishing the fire extremely difficult. *Id.*

As this relevant case law provides at least two distinct approaches, we find it helpful when considering the question of "knowledge" to recall that "the length of the hypothetical knowledge continuum" is marked by "constructive knowledge" at one end and "actual knowledge" at the other with various "gradations," such as "notice of likelihood" in the "poorly charted area that stretches between the poles." *Spinney,* 65 F.3d at 236–37 (discussing the continuum in the context of the "shared knowledge" requirement in prosecution of aiding and abetting armed robbery). In terms of this continuum, "practical certainty" would seem most akin to "actual knowledge." *Id.* (noting that "[a]ctual knowledge, after all, is certain knowledge"). We are inclined to conclude that a showing of knowledge anywhere along this continuum satisfies application of § 2K1.4(a)(1)(A).[30] This approach would be

---

**29.** The Model Penal Code's definition of "knowingly" provides that:

> A person acts knowingly with respect to a material element of an offense when: ...
> (ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

*Model Penal Code* § 2.02(2)(b) (1985). The Model Penal Code also states that "[w]hen knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person is aware of a high probability of its existence, unless he actually believes it does not exist." *Model Penal Code* § 2.02(7) (1985).

**30.** "Constructive knowledge is the law's way of recognizing that, given an awareness of certain subsidiary facts, a person is quite likely to know,

consistent both with the guidelines' mandate that a meaningful distinction be made between the two highest base offense levels as well as with the "common sense" approach we endorsed in *Medeiros*. *See Medeiros*, 897 F.2d at 20. That said, however, at this juncture we need not definitively resolve what level of knowledge, in addition to "actual knowledge," is required. Even assuming without deciding that, for § 2K1.4(a)(1)(A) to apply, Appellant had to be "aware that a substantial risk of death or serious bodily injury was 'practically certain' to result from the criminal act," *Karlic*, 997 F.2d at 569, we reject Appellant's contention that the district court's findings are clearly erroneous.

On appeal, Appellant argues that the district court clearly erred in finding that he knowingly created the substantial risk, because "[it] made no finding that a substantial risk of death or serious bodily injury was 'practically certain' to result from his [attempted arson]." Appellant contends that the district court's findings that the restaurant was occupied at the time the gasoline was poured and that the vapors could have been accidentally ignited is insufficient for the application of § 2K1.4(a)(1)(A), because the record does not show by a preponderance of the evidence that Appellant was "practically certain" that an accidental cause could have started the fire.

Giving due deference to the court's application of the guidelines to the facts, we conclude that the district court did not clearly err in finding that Appellant "knew that ... there was a substantial risk of death or serious bodily injury" (Sentencing Transcript at 23). In arriving at our conclusion, we note that facts contained in a presentence report ordinarily are considered reliable evidence for sentencing purposes. *See United States v. Morillo*, 8 F.3d 864, 872 (1st Cir.1993). Indeed, district courts possess "broad discretion to determine what data is, or is not,

sufficiently dependable to be used in imposing sentence." *United States v. Tardiff*, 969 F.2d 1283, 1287 (1st Cir.1992). This is particularly true where, as here, Appellant offered no evidence to suggest an inaccuracy in the presentence report's facts. *Id.*, 8 F.3d at 873 (collecting cases).

The record shows that, at the time of the first attempt,[31] Appellant knew that at least two other employees, including Schaller (who at that time was not a participant in the offense), were in the restaurant. As the court in *Honeycutt* noted, "[i]t is difficult to imagine a clearer illustration of the knowing creation of a substantial risk of death or serious bodily injury." *Honeycutt*, 8 F.3d at 787 (affirming application of § 2K1.4(a)(1)(A) where defendant threw a Molotov cocktail at a structure that he admitted he knew was occupied). In terms of our continuum, this strikes us as constituting "actual knowledge" and/or "practical certainty."

At the time of the second attempt, the record shows that gasoline was poured, hours before the intended ignition, in a confined area atop the Galleria II at a time when both patrons and employees were inside. Appellant knew gasoline was a highly flammable liquid and he arranged for it to be poured for the specific intent of lighting a fire after business hours. In response to Appellant's "practical certainty" argument, the district court found that "the fact that [Appellant] ... wanted to [ignite] the fire outside of business hours, suggests ... that he knew of the risk" to people inside the building and to those who would respond to the fire. (Sentencing Transcript at 18). Contrary to Appellant's contentions, these findings are sufficient for the application of the highest base offense level. While Appellant may not have been aware that it was "practically certain" that a fire could ignite *accidentally* or that the restaurant and any occupants could be blown to "smithereens," (Sentencing Tran-

---

can be expected to know, or at least should have known that a further fact existed." *Spinney*, 65 F.3d at 236. In contrast, "[a]ctual knowledge, as the term implies, reduces the need for inference; it suggests the presence of particular evidence which, if credited, establishes conclusively that the person in question knew of the existence of the fact in question." *Id.*

**31.** We address the first count (the attempt to start a fire in the attic with paper) even though Appellant's brief only focuses on the second count (involving the gasoline).

script at 20), we remind Appellant—as the district court did more than once—that the guidelines call for the knowing creation of a substantial *risk*. Here, a preponderance of the evidence supports the finding that Appellant was aware that a substantial risk of death or serious bodily injury was "practically certain" to result from the use of a highly flammable accelerant for purposes of starting a fire. Appellant presented no evidence to rebut the preponderance of the evidence presented on this point. Furthermore, we find irrelevant whether or not Appellant was "practically certain" that an *accidental* ignition would occur given that the record supports a finding that he was "practically certain" that he was creating a substantial *risk* of death or serious bodily injury. Finally, the district court again correctly rejected Appellant's argument that he did not knowingly create a risk because no fire or explosion actually occurred. *See Honeycutt*, 8 F.3d at 787 ("[t]he fact that fortuitously no one was injured and extensive damage did not result does not further [A]ppellant's contention that he did not knowingly create a substantial risk."). At issue is Appellant's state of mind, not the actual results of his actions. *Id.; cf. Medeiros*, 897 F.2d at 20 (finding that the defendant "specifically intended to cause the kind of fire that recklessly would endanger others").

### C. Two–Level Enhancement for Leadership Role

██ Finally, Appellant appeals the two-level enhancement which the district court imposed for his leadership role in the offense. *See* U.S.S.G. § 3B1.1(c). As we have said before, "role in the offense" determinations are fact intensive and we normally review for clear error. *See United States v. Tejada–Beltrán*, 50 F.3d 105, 111 (1st Cir.1995); *United States v. Schultz*, 970 F.2d 960, 963–64 (1st Cir.1992), *cert. denied*, 506 U.S. 1069, 113 S.Ct. 1020, 122 L.Ed.2d 167 (1993) (citations omitted). Appellant argues that he and Schaller were, at best, "equals" and nothing more than "partners in crime."

Under U.S.S.G. § 3B1.1(c), a two-level enhancement is warranted if the sentencing court determines that the criminal enterprise involved at least two participants, and the defendant exercised control over, or was otherwise responsible for organizing the activities of, at least one other individual in committing the crime. *See, e.g., Morillo*, 8 F.3d at 872; *United States v. Akitoye*, 923 F.2d 221, 227 (1st Cir.1991). For purposes of determining the overall number of participants, the defendant himself may be counted as one participant; "[b]ut, he must exercise control over at least one other participant to warrant an upward adjustment." *Morillo*, 8 F.3d at 872 n. 13. In determining whether a defendant is an organizer or leader, the Sentencing Guidelines direct judges' attention to seven factors, including "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, comment.; *see Tejada–Beltrán*, 50 F.3d at 111–13 ("This list is intended to be representative rather than exhaustive."). Finally, the government must bear the burden of proving that an upward role-in-the-offense adjustment is warranted. *Morillo*, 8 F.3d at 872.

Here, it is undisputed that Appellant and Schaller participated in the attempted arson of the Galleria II. Contrary to Appellant's contention that he and Schaller were mere "equals," evidence was submitted at trial that it was Appellant's idea to burn the Galleria II; that Appellant devised the time and method of committing the offense; that Schaller was persuaded and, ultimately, recruited by Appellant after Appellant failed to hire someone else to commit the offense and after his unsuccessful attempt to start a fire in the attic; and that Schaller poured the gasoline at Appellant's request and informed Appellant when he was finished. Contrary to Appellant's argument, these factual findings satisfy the requirements for applying § 3B1.1(c). We are unpersuaded by Appellant's argument that the fact that Appellant asked or persuaded Schaller to pour gasoline does not show supervision over him. While it may not show supervision, it certainly

shows—at a minimum—Appellant's exercise of decision making authority, his recruitment of accomplices, and the greater degree of his participation in planning and organizing the two arson attempts. Thus, finding no clear error in the district court's determination of Appellant's role,[32] we affirm the district court's two-level enhancement. *United States v. Garcia*, 954 F.2d 12, 18 (1st Cir. 1992) (noting that, absent a mistake of law, sentencing court's role-in-the-offense determination is reviewed only for clear error).

### CONCLUSION

For the foregoing reasons, the district court's judgment and sentence is, in all respects,

Affirmed.

---

**32.** Appellant also contends that "[t]he finding that [Appellant] stood to gain financially from the fire is also erroneous." The government argued that Appellant—and not Schaller, who had no ownership interest in the restaurant or the building—stood to gain financially from a fire at the Galleria II and, thus, had a "claimed right to a larger share of the fruits of the crime." U.S.S.G. § 3B1.1, comment. We need not address this argument as the district court neither made, nor relied on, this "finding" when it concluded that adjustment under U.S.S.G. § 3B1.1 was justified. *See* Sentencing Transcript, page 28. Even assuming *arguendo* that such a "finding" were clearly erroneous, we would nonetheless affirm the district court's adjustment based on the evidence of Appellant's role in the offense.